Walter F. HARRIS, Plaintiff,

v.

W. A. NEWMAN and Steve Marinovich, jointly and severally, in personam and F/V the VICTORY, her engines, tackles, nets, etc., in rem, Defendants.

Civ. A. No. S74–209(C).

United States District Court,
S. D. Mississippi, S. D.

Dec. 8, 1975.

Kelly McKoin, Biloxi, Miss., for plaintiff.

Carl J. Barbier, New Orleans, La., for defendants.

DANIEL HOLCOMBE THOMAS, District Judge.

The above-styled cause was heard by the Court without a jury and taken under submission on the 1st day of October 1975. The Court, after examining the pleadings and the evidence presented at the trial makes the following Findings of Fact and Conclusions of Law involved in the collision of the vessel F/V MISS JEAN, owned by the plaintiff, Walter F. Harris, and the vessel F/V THE VICTORY, owned by the defendant, W. A. Newman.

### FINDINGS OF FACT

1. Plaintiff, Harris, is and was, at all material times, an individual resident of the State of Mississippi and the owner and operator of the F/V MISS JEAN.

2. Defendant, Newman, is and was, at all material times, an individual resident of the State of Mississippi and the owner and operator of the F/V THE VICTORY.

3. Steve Marinovich, a named defendant in the complaint, was the former owner of the F/V THE VICTORY (VICTORY) and at the time of the collision had no ownership or other interest in the vessel or in its fishing activities and therefore, is not a party to this action.

4. The F/V MISS JEAN (MISS JEAN) and the VICTORY were involved in a marine collision in the early morning hours of August 28, 1973, before dawn. The collision occurred in the Mississippi Sound area of the Gulf of Mexico, approximately four miles south

of the Biloxi Beacon, (Joint Ex. 1) [1] resulting in the sinking of the MISS JEAN (Pl.Ex. 1a, 1b, 1c, 1d).

5. It is stipulated by the parties that at the time of the collision, the weather was fair, visibility was good and the skies were generally clear, although it had become somewhat cloudy or overcast prior to the collision.

6. At the time of the collision the MISS JEAN was pulling a trawl while in the process of shrimping and traveling at approximately four or five miles per hour. The plaintiff was alone aboard the vessel.

7. The VICTORY had completed its trawling activities for the night and was proceeding into the Port of Biloxi. The defendant, Newman, who was alone on his vessel, testified that he had his vessel on "automatic pilot" to maintain course. The defendant further testified that he had his compass bearing on 45° proceeding in a generally northeasterly direction toward the Biloxi Beacon at approximately seven miles per hour. It is undisputed that at the time of the collision the defendant had a floodlight on his forward deck where he was "picking shrimp". According to the defendant, he was stationed in the "wing of the boat, two feet in front of my wheelhouse." Newman testified that he would bend over for approximately 25 seconds at a time to pick shrimp and then look up into the waters to see if his course was clear. The defendant admitted in filling out and filing the Coast Guard report on September 4, 1973, that he did not see the MISS JEAN at any time as he was approaching the vessel. (Pl.Ex. 3) [2]:

"VICTORY was on way to Biloxi Beacon heading NNE. Did not see MISS JEAN on Port Bow. MISS JEAN was trawling heading SE. *I looked ahead of my boat 2 or 3 times but did not see no boat.* Next thing I knew MISS JEAN was in front of VICTORY's Bow. Jamed in STB Side. Stopped engine told Walter Harris to get aboard VICTORY as boat was sinking which he did. We backed away." (Emphasis Added) (Spelling and punctuation as in the original)

8. There was conflicting testimony as to whether the MISS JEAN had proper running and trawling lights at the time of the collision. Harris testified that all of his lights were in operation. The defendant asserts that the MISS JEAN did not have on her green and red running lights. The defendant further asserts that the vessel did not have her red light over the white light required by Inland Rules of the Road, Art. 9(c), for vessels engaged in fishing.[3] Notwithstanding the disputed testimony, the Court is of the opinion that it is not necessary to determine this controverted subject in that the defendant was not keeping a proper lookout. Therefore, the Court finds that the presence or absence of lights is immaterial in that even if the MISS JEAN was fully lighted as Harris said the vessel was,

---

1. References preceded by "Pl. Ex." or "Def. Ex." are to the exhibits admitted into evidence during the trial on behalf of the plaintiff or defendant respectively. References preceded by "Joint Ex." are to the exhibits admitted into evidence jointly by the plaintiff and defendant.

2. At the trial the defendant testified that he saw the MISS JEAN when he was approximately five feet from the vessel prior to the collision.

3. Art. 9(c) reads as follows: "All vessels, when trawling, dredging, or fishing with any kind of dragnets or lines, shall exhibit, from some part of the vessel where they can be best seen, two lights. One of these lights shall be red and the other shall be white. The red light shall be above the white light, and shall be at a vertical distance from it of not less than six feet and not more than twelve feet; and the horizontal distance between them if any, shall not be more than ten feet. These two lights shall be of such character and contained in lanterns of such construction as to be visible all around the horizon, the white light a distance of not less than three miles and the red light of not less than two miles."

Newman could not have seen her so as to avoid the collision. It is common knowledge of all mariners that it takes a certain amount of time to accustom one's eyes to the darkness before one can maintain a proper lookout.

■ 9. The defendant asserts that the MISS JEAN was approaching his vessel from the port side in a crossing situation and under Article 19 of the Inland Rules of the Road, the MISS JEAN was the "burden" vessel with the obligation to keep clear of the VICTORY.[4] Based on the testimony presented at trial, the Court is of the opinion that it is the local, if not universal, custom that where boats are trawling for shrimp, the vessel pulling the trawl has the right of way over a vessel running free. The facts clearly establish that the MISS JEAN was trawling and it is much easier for the free running vessel to maneuver than for a trawling vessel. The Court finds that the defendant knew, or should have known, that other shrimp trawlers were in the general area and therefore, Newman had a mandatory duty to keep a careful and proper lookout at all times.

10. The defendant avers in its counter-claim that the aforesaid collision was due to the negligence and fault of the plaintiff. It is the defendant's theory that Harris was operating the MISS JEAN in a negligent and careless manner in that Harris was on the stern of the vessel working on the tiller and as a result, Harris was unable to give any warning signals to the VICTORY prior to the collision. The plaintiff testified that he was maintaining a proper lookout and was standing outside of his pilot house within reach of the vessel's wheel. The plaintiff further stated that the reason that he did not see the VICTORY any sooner was that his vessel was being overtaken by the VICTORY from the rear and due to the VICTORY's extreme high bow any lights that she was showing were difficult to observe. (Pl.Ex. 2a, 2b) The Court does not find that the plaintiff was operating his vessel in a negligent and careless manner.

11. Although there is agreement between the parties as to the approximate location of the collision (Joint Ex. 1) there is dispute as to the direction that the vessels were traveling prior to the collision. (Def.Ex. 1, 2, 5) The plaintiff testified that he was heading in a Northeast or East Northeast direction at approximately 60° and when he first saw the VICTORY it was some fifty feet from his starboard stern traveling in a northeasterly direction close to 50°. The defendant admitted that his automatic pilot plotted his course at 45°. The only testimony as to the direction of the vessel MISS JEAN prior to the collision is that of the plaintiff. The defendant admits that he did not see the vessel, however, Newman testified that the MISS JEAN was headed in a Southeast direction. The Court is of the opinion that a logical explanation for the defendant's assumption that the MISS JEAN was headed in a Southeast direction was that the weight and speed of the VICTORY coupled with its collision with the MISS JEAN changed the direction of the plaintiff's vessel. This theory is corroborated by the fact that the VICTORY's weight is estimated at 19 tons whereas, the weight of the MISS JEAN was under 5 tons. (Pl.Ex. 3) Moreover, the superior speed of the VICTORY is an additional factor to be considered in determining whether the VICTORY could have altered the direction of the MISS JEAN. Based on the evidence, the Court finds that the VICTORY was traveling at 7 miles per hour and was some 14 gross tons heavier than the MISS JEAN. The Court further finds that when the VICTORY struck the trawling vessel mid-ship "aft the

4. Art. 19. When two steam vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other.

house" on the starboard side the impact of the collision caused the bow of the struck vessel to turn direction.

■■ 12. After the sinking of the MISS JEAN the defendant rendered assistance to the plaintiff and was primarily responsible in helping the plaintiff raise and tow the MISS JEAN to Deer Island. It is undisputed that Newman contacted a marine diver and several local fisherman in an attempt to assist Harris in salvaging the vessel. The plaintiff attempted to show at trial that Newman's actions in attempting to raise and salvage the MISS JEAN and certain oral statements allegedly made by the defendant after the collision are to be considered as admissions of liability. The Court finds that the efforts made by Newman to assist the plaintiff in salvaging the MISS JEAN are not to be interpreted as any type of admission of liability by the defendant. The Court further finds that the evidence clearly shows that it is the local custom among fishermen in this area to render assistance in time of need. Newman had an obligation to furnish assistance and the Court is of the opinion that the defendant acted in a proper manner following this maritime collision.

■ 13. In sum, the Court finds that the sole proximate cause of this collision was the negligence and fault of the defendant, in that Newman failed to maintain a proper lookout.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over this matter based upon its admiralty and maritime jurisdiction, 28 U.S.C.A. § 1333.

■ 2. The plaintiff herein asserts that the defendant in not keeping a proper lookout was the sole cause of the collision between the MISS JEAN and the VICTORY. Without a lengthy discussion of the statutory rules of navigation and the standard of care that governs the conduct of vessels, suffice it to say that the Inland Rules of the Road (Inland Rules) are the regulations that control the movement of vessels where this collision occurred. In the instant case, the defendant had a duty to keep a constant and careful lookout. The Inland Rules provide as follows:

> "Section 221. Usual additional precautions required generally (Art. 29)
>
> "Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, *or of any neglect to keep a proper lookout* . . . ." (Emphasis added) 33 U.S.C.A. § 221.

As previously stated, the defendant did not see the MISS JEAN prior to the collision. Moreover, the defendant knew, or should have known that other shrimp trawlers were in the general area and therefore, the Court finds that Newman had a mandatory duty to keep a careful and proper lookout at all times and certainly not to leave the course to automatic pilot while he was picking shrimp. The rule of maintaining a prudent lookout is one of the strictest requirements in the law of admiralty. *Clary Towing Co., Inc. v. Port Arthur Towing Co.*, 367 F.Supp. 6, 11 (E.D.Tex.1973); *Moran Scow Corporation v. S. S. Boston*, 342 F.Supp. 216, 239 (S.D.N.Y.1972).

3. The defendant asserts that the MISS JEAN and the VICTORY were on a crossing course prior to the collision and under Inland Rules, Art. 19,[5] the MISS JEAN which had the VICTORY on her starboard side, was the "burdened" vessel and had the duty to avoid crossing ahead of the VICTORY. The defendant further asserts that the plaintiff's vessel had the obligation to keep clear of the VICTORY and, if necessary, was obligated to slacken her speed or stop and reverse. Inland Rules,

5. See Note 4, *supra.*

Arts. 22, 23.[6] Based on the evidence the Court finds that the VICTORY did not have the right of way prior to the collision. A trawling vessel running very slow with its nets out attached to a trawling board would have an extremely difficult time to stop and reverse its engines due to the tangling of the ropes and nets in the vessel's propellors. Admittedly, a vessel running free is certainly more maneuverable.

Assuming, however, that local custom conflicts with the Inland Rules, the evidence shows that the defendant violated Inland Rules, Art. 24[7] in that the VICTORY was overtaking the MISS JEAN prior to collision. The MISS JEAN's course at approximately 60° and the defendant's course at 45° places the VICTORY "more than two points abaft her beam." Accordingly, the VICTORY was under a duty to yield the right of way to the plaintiff's vessel. (See Finding 11)

4. The defendant contends that the MISS JEAN was operating without proper running lights and without the required trawling lights in violation of Inland Rules, Art. 9(c). The plaintiff testified that he had the proper lights on his vessel when he departed from the ship yard the day before the collision.

The Court is of the opinion there is insufficient evidence to find that the plaintiff had violated Inland Rules, Art. 9(c).

5. In maritime collision cases the degree of fault in effect determines the liability of the parties. The defendant herein asserts that should the defendant be found negligent the Court should apportion the total damages arising out of the collision between the two vessels based upon the relative degree of negligence or fault. The Court is fully aware that the harsh and long-standing admiralty rule of divided damages has been replaced by the more equitable rule requiring liability for such damage to be allocated among the parties proportionately to the comparative degree of the fault. *United States v. Reliable Transfer Co.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975).[8] However, where the collision is attributable to the fault of one of the vessels only, then that vessel is responsible for its own loss as well as the damages it caused to the other vessel. *The Clara,* 102 U.S. 200, 202, 26 L.Ed. 145 (1880). In the instant case, the MISS JEAN did nothing which actively contributed to the collision. Therefore, this case provides an apt occasion for application of the rule:

---

**6.** Art. 22. Every vessel which is directed by these rules to keep out of the way of another vessel shall, if the circumstances of the case admit, avoid crossing ahead of the other.

Art. 23. Every steam vessel which is directed by these rules to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed or stop or reverse.

**7.** Overtaking Vessel. Art. 24. "Notwithstanding anything contained in these rules every vessel, overtaking any other, shall keep out of the way of the overtaken vessel.

Every vessel coming up with another vessel from any direction more than two points abaft her beam, that is, in such a position with reference to the vessel which she is overtaking that at night she would be unable to see either of that vessel's side lights, shall be deemed to be the overtaking vessel; and no subsequent alteration of the bearing

between the two vessels shall make the overtaking vessel a crossing vessel within the meaning of these rules, or relieve her of the duty of keeping clear of the overtaken vessel until she is finally past and clear. . . . ."

**8.** In overruling the admiralty rule of divided damages, Justice Stewart expressing the unanimous view of the court stated at 95 S. Ct. 1708, 1715, 44 L.Ed.2d 251, 262:

"We hold that when two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault."

"Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption at least adverse to its claim, and any reasonable doubt with regard to the propriety of the conduct of such other vessel should be resolved in its favor." *The City of New York,* 147 U.S. 72, 85, 13 S.Ct. 211, 216, 37 L.Ed. 84 (1893).

See also *The Victory and the Plymothian,* 168 U.S. 410, 18 S.Ct. 149, 42 L.Ed. 519 (1897); *The Umbria,* 166 U.S. 404, 17 S.Ct. 610, 41 L.Ed. 1053 (1897); *Gulfcoast Transit Company v. M/S Kyung-Ju,* 343 F.Supp. 867 (E.D.La. 1972).

Discussion of the "major-minor" fault doctrine is unnecessary in that the Court finds that the sole and proximate cause of the collision was the gross negligence and statutory violations of the VICTORY and her operator, W. A. Newman. It has been held that:

"where the active fault of one vessel so flagrantly and heavily outweighs the passive fault of omission of the other vessel, the interests of justice are best served by condemning the more culpable vessel completely." *Compania De Maderas, De Caibarien, S. A. v. The Queenston Heights,* 220 F.2d 120, 123 (5th Cir. 1955), cert. denied, 350 U.S. 824, 76 S.Ct. 52, 100 L.Ed. 736 (1955).

In conclusion, the Court finds that the defendant was the sole cause of the collision in question and therefore, the defendant is liable to the plaintiff for damages.

 6. DAMAGES: Generally in maritime collision cases the injured party is entitled to full compensation for what he has lost, including loss of use while the vessel is being repaired. *Continental Oil Company v. S. S. Electra,* 431 F.2d 391 (5th Cir. 1970). The plaintiff claims that the vessel is valued between $7,000.00 and $8,000.00. The vessel was purchased in May of 1970 for a total price of $3,000.00. (Def.Ex. 4) The Court is of the opinion that the plaintiff should be allowed damages for the loss of the vessel in the sum of $4,000.00.

 In addition, the plaintiff claims loss of earnings in the amount of $4,000.00 and places a value of $1,000.00 on personal property lost as a result of the collision. It is well recognized that the owner of a vessel which is involved in a maritime collision and damaged must do all things necessary to mitigate his damages. *Brooklyn Eastern District Terminal v. United States,* 287 U.S. 170, 53 S.Ct. 103, 77 L.Ed. 240 (1932). It is undisputed that Harris made no attempt to salvage whatever personal belongings were aboard the vessel until several days following the collision. Moreover, the plaintiff failed to produce any bills or receipts showing the cost of any of the items of personal property. The Court finds that the defendant is not liable to the plaintiff for the loss of his personal property. With regard to the loss of earnings claimed by Harris, the plaintiff failed to produce copies of his tax returns or other documentary evidence to show what his earnings were prior to the collision. Based on the testimony it seems that had the plaintiff attempted to salvage the vessel it could have been repaired and put back into service in approximately four to six weeks. Accordingly, the Court finds that the plaintiff is entitled to six weeks loss of earnings in the sum of $750.00. In total, the plaintiff should recover of and from the defendant the sum of $4,750.00, together with interest thereon from the date of this judgment to date of payment at six percent (6%) per annum, and all costs of Court.

Judgment in accordance herewith will be entered.

## JUDGMENT

This cause having come on for final hearing on the pleadings and proof and having been taken under submission the Court after due deliberation having entered its Findings of Fact and Conclusions of Law, it is ORDERED, ADJUDGED and DECREED that a judgment in the amount of FOUR THOUSAND, SEVEN HUNDRED FIFTY AND NO/100 DOLLARS ($4,750.00) be, and hereby is, entered in favor of the plaintiff, Walter F. Harris and against the defendant, W. A. Newman, together with interest thereon from the date of this judgment to date of payment at the rate of six percent (6%) per annum until paid.

Costs taxed against the defendant.