James A. CHUTE, Administrator of the Estate of James L. Chute, and Helen L. Dotteridge, Administratrix of the Estate of Harlan Lincoln Matthews

v.

UNITED STATES of America.

Civ. A. No. 72–3412–F.

United States District Court, D. Massachusetts.

Feb. 17, 1978.

Joseph G. Abromovitz, Boston, Mass., for plaintiff.

William B. Sleigh Jr., Boston, Mass., for third party defendant.

Henry H. Hammond, Asst. U. S. Atty., Boston, Mass., David V. Hutchinson, U. S. Dept. of Justice, Washington, D. C., for the United States.

## OPINION

FREEDMAN, District Judge.

The plaintiff, James A. Chute, is the son of James L. Chute and the administrator of his estate. The plaintiff, Helen L. Dotteridge, is the daughter of Harlan Lincoln

Matthews and the administratrix of his estate. Both plaintiffs have brought this action to recover for the deaths of their respective fathers as a result of the sinking of the boat AD LIB II on September 30, 1971 in Nantucket Sound.[1] Both decedents had been guests on the AD LIB II, which was owned and operated by Dr. Robert L. Baxter, a friend. Plaintiffs allege the AD LIB II sunk when it struck a submerged wreck on Horseshoe Shoals in Nantucket Sound, approximately seven to eight miles south-southwest of Hyannis Port, Massachusetts. The plaintiffs contend that the wreck was improperly marked by the defendant, the United States. The wreck consists of a Navy ship, PC1203, which had been deliberately grounded on Horseshoe Shoals in 1949 for use as a bombing target.

## JURISDICTION

The plaintiffs brought their action under 28 U.S.C. § 1333, the Public Vessels Act, 46 U.S.C. §§ 781 *et seq.*, the Suits in Admiralty Act, 46 U.S.C. §§ 741 *et seq.*, the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.*, the general maritime law, Massachusetts common law, and the Massachusetts wrongful death act, M.G.L. c. 229 § 1 *et seq.* For the reasons stated below, the court concludes that jurisdiction in this case is properly established under 28 U.S.C. § 1333, the Suits in Admiralty Act, 46 U.S.C. §§ 741 *et seq.*, and the general maritime law.

The Federal Tort Claims Act expressly excludes from its coverage any claim for which the Suits in Admiralty Act, 46 U.S.C. §§ 741–752, or the Public Vessels Act, 46 U.S.C. §§ 781–790, provides a remedy. 28 U.S.C. § 2680(d). While there is authority to the contrary, *J. W. Petersen Coal & Oil Co. v. United States*, 323 F.Supp. 1198 (N.D.Ill.1970), the majority view and one adopted in this Circuit is that the present action arises in admiralty, and not under the Federal Tort Claims Act. *Gercey v. United States*, 540 F.2d 536, 537 n. 1 (1st Cir. 1976), *cert. denied*, 430 U.S. 954, 97 S.Ct. 1599, 51 L.Ed.2d 804 (1977), and cases cited therein. *See also, United States v. United Continental Tuna Corp.*, 425 U.S. 164, 176 n. 14, 96 S.Ct. 1319, 47 L.Ed.2d 653 (1976). Suits in admiralty are governed by federal substantive and procedural law, *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 628, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959).

As between the Suits in Admiralty Act and the Public Vessels Act, the court concludes that the former is the more appropriate basis for jurisdiction. While the PC1203 was at one time "a public vessel of the United States," 46 U.S.C. § 781, it does not automatically always remain so. Once the PC1203 was destroyed as a vessel and became merely a bombing target, it no longer possessed any attributes of a public vessel and could thus not be characterized as such. Consequently, the Public Vessels Act is inapplicable. Jurisdiction therefore properly lies under the Suits in Admiralty Act. The Suits in Admiralty Act constitutes a waiver of sovereign immunity of the United States for certain maritime claims against the federal government. *Gercey v. United States, supra*, 540 F.2d at 539. The scope of this waiver will be discussed subsequently when the nature of the Coast Guard's duty to mark the wreck is examined.

This court also concludes that plaintiffs' action arises under the general maritime law and is not based on either the Massachusetts wrongful death act or the common law of Massachusetts. *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970); *Sea-Land Services, Inc. v. Gaudet*, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9, *reh. denied* 415 U.S. 986, 94 S.Ct. 1582, 39 L.Ed.2d 883 (1974); *cf. Barbe v. Drummond*, 507 F.2d 794 (1st Cir. 1974).

## EVIDENTIARY RULINGS

The court reserved judgment on the admissibility of several exhibits during trial. In order that it is clear which evidence

---

1. By agreement, the present trial involved only the liability issue. Upon a finding of such liability, a subsequent trial on damages would be necessary.

the court relies upon in rendering its decision, the court makes the following evidentiary rulings. The plaintiffs had sought to introduce two letters of correspondence between Chester Crosby and Lieutenant Commander Ransom K. Boyce, then the Assistant Chief, Aids to Navigation Branch of the U. S. First Coast Guard District. Crosby was Chairman of the Waterways Committee, an advisory committee to the Board of Selectmen of the Town of Barnstable, Massachusetts, with regard to problems around the harbors and waterways. Writing to the Coast Guard in his capacity as Chairman, under date of October 4, 1971, Crosby expressed concern as to the adequacy of the marking of the wreck of the PC1203. As will be discussed in this court's Findings of Fact, the buoy set up to mark the PC1203 was not placed directly on the wreck, but at some distance from it. The letter from Crosby, Plaintiffs' Exhibit 15, refers to a previous request to have the Coast Guard attach a day beacon to the wreck and the fact that that request had been refused. It further acknowledges the problem of placing buoys close to submerged wrecks, but suggests that "since the United States Navy placed the wreck on the shoal, couldn't an eventual solution be to have them dynamite the remains [of the wreck] during the late fall after the fishing season and remove the debris." Boyce's response, dated October 13, 1971, Plaintiffs' Exhibit 16, states that the Coast Guard had decided "to blow up the remains of the wreck and wire drag the area to the depth of five feet below the reference plane," and concludes that "[i]t is felt that this is a satisfactory solution to the problem." Crosby was called by the plaintiffs as a witness at trial. The defendant argues that the correspondence is irrelevant since it occurred after the date of the accident. The plaintiffs argue the letters are admissible on the ground they demonstrate the feasibility of alternative means of protecting the boating public from the wreck remains, namely blowing up the wreck, citing Fed.Rules Evid. Rule 407, 28 U.S.C.A. I agree with the plaintiffs and therefore find the letters, Plaintiffs' Exhibits 15 and 16, admissible.

The plaintiffs also attempted to introduce a Coast Guard record of telephone contact, dated October 8, 1971, Plaintiffs' Exhibit 17, regarding the procedures to be taken in order to dynamite the PC1203 wreck. The record is offered for the same purpose as the letters discussed, *supra,* and for the same reasons, I conclude Plaintiffs' Exhibit 17 is also admissible.

■ Finally, plaintiffs wish to introduce several letters of correspondence between John T. Fallon, an interested mariner in the area, and the Coast Guard. The first letter, Plaintiffs' Exhibit 18, dated October 18, 1971, and addressed to Commander Anthony Nigro of the U. S. First Coast Guard District, expresses concern with regard to the inadequacy of the Coast Guard's placement of the buoy to mark the wreck of the PC1203. Fallon suggests that either the Coast Guard blow up the wreck completely or put a buoy directly on the wreck. Plaintiffs maintain the letter is admissible to show the feasibility of blowing up the wreck remains prior to the accident involving the AD LIB II. Although the Coast Guard admits receiving the letter, Mr. Fallon was not called as a witness at trial. The letter is therefore inadmissible hearsay. Moreover, since the letter was written subsequent to the sinking of the AD LIB II, it could not have served as any type of notice to the Coast Guard prior to the accident as to the inadequacy of the government's marking of the wreck. For these reasons, the letter from Mr. Fallon, dated October 18, 1971, Plaintiffs' Exhibit 18, is not admissible.

■ On November 4, 1971, Lieutenant Commander Ransom K. Boyce responded to Mr. Fallon's letter. This is the same officer who responded to Mr. Crosby's letter. No one disputes that this letter was written "[b]y direction" of the Commander of the First Coast Guard District. This letter, Plaintiffs' Exhibit 19, states in relevant part:

In reply to your letter of 18 October 1971 concerning the unfortunate sinking of the AD LIB II with the attendant loss of life

on Horseshoe Shoals, the U. S. Coast Guard has presently contracted to have the remains of this wreck removed and wire dragged to a depth of five feet above the reference plane. It is felt that this solution will prevent another unfortunate occurrence. . . . your suggestion to buoy directly above the wreck, although desirable, is not practical and had not been done in the past.

The plaintiffs assert this letter is admissible primarily on two theories. First, that it also demonstrates the feasibility of blowing up the wreck as a precautionary measure to prevent boats from colliding with the wreck. Second, the plaintiffs contend the letter is admissible as an admission by the government that the AD LIB II sank because it hit the wreck and not the shoals. Plaintiffs argue that the inference necessary to find that this letter is such an admission can be drawn from the first part of the letter, as quoted above, since it would not otherwise make sense for the Coast Guard to combine in the same sentence references to both the AD LIB II's sinking and the government's decision to blow up the PC1203 wreck. That such an inference can be drawn is further supported by the next sentence in the letter to the effect that demolishing the wreck "will prevent *another* unfortunate occurrence." (Emphasis added.) The court agrees that the letter from Lieutenant Commander Boyce to Mr. Fallon, Plaintiffs' Exhibit 19, is admissible because it is probative on the issue of the feasibility of alternative measures to protect the boating public from the wreck— namely demolition of the wreck—prior to the sinking of the AD LIB II, Fed.Rules Evid. Rule 407, 28 U.S.C.A., and because, by inference, it can be viewed as an admission by the Coast Guard that the AD LIB II sank because it hit the wreck.

The plaintiffs also seek to admit the letter from Mr. Fallon, dated November 5, 1971, in response to the November 4, 1971 letter of Lieutenant Commander Boyce.

The court concludes that this letter, Plaintiffs' Exhibit 20, is hearsay and is not probative on the issues involved in this case. Therefore, it is not admissible.

### FINDINGS OF FACT

I. *Marking the PC1203 Wreck.*

The PC1203 allegedly hit by the AD LIB II was a former Navy patrol craft. At all times material to this case, little, if any, of the remains of the PC1203 wreck was above the water's surface except at low tide when small portions of the vessel broke the water's surface. The depth of the water in the vicinity of the wreck varies according to the tides from approximately 2 feet to 4.8 feet. See Tr. Vol. 2 at 18 (Dec. 16, 1976) and Tr. Vol. 1 at 71 (Dec. 17, 1976).

From 1949 to 1961, the area where the PC1203 was grounded was designated as a danger area. In 1961, the danger designation of the area was removed. During this period, the PC1203's location was unmarked except for a pipe affixed to it by persons unknown. This pipe, however, was destroyed during a hurricane in the mid-1950's.

In July, 1963, as a result of requests from local maritime interests, a can buoy with a visual range of one and a quarter miles was established 275 yards, 270° True (west) from the wreck. This buoy was black and red with a reflector, but had no light or gong. It was designed for a semiexposed area, having a water depth of 15 to 540 feet. The draft of the buoy was 6 feet 8 inches. The height of the buoy above water was 6 feet 10 inches. It had a 5000-pound sinker to moor it.

A memorandum dated October 22, 1965 to the Coast Guard Commandant from the Commander, First Guard District, and signed by Captain C. G. Houtsma[2] "by direction" of the Commander, discussed the adequacy of this buoy marking and concluded that the position and type of buoy was adequate to mark the wreck of the PC1203. It noted that

2. This is the same Captain Houtsma called by the plaintiffs as an expert. See p. 184, *infra*, and n. 15, *infra*.

3. . . . For the imprudent or uninitiated boatman, or the pleasure fisherman who is trolling or drifting aimlessly, the only satisfactory position of the buoy would be directly over the wreck, which is impractical. As a convenience for the fisherman, it may be possible to relocate the buoy closer to the wreck after a survey of the area by a shallow draft boat; but such a relocation would impose additional restrictions and risks to the servicing tender, which, in this situation, is considered unwarranted.

The memorandum, however, then went on to state:

4. Since making no change is unlikely to satisfy the complainants in this matter, it appears that there are several alternatives possible to alleviate the problem:

a. Obtain congressional support in asking the Navy to remove the wreck, or have the Navy reimburse the Corps of Engineers for its removal.

b. Obtain a specific authorization from Congress for the Coast Guard to pay for the removal of the wreck.

c. Obtain permission from the Corps of Engineers to place sufficient riprap at the location of the wreck to insure a visible object at all stages of the tide.

d. Erect a daybeacon structure immediately adjacent to the wreck.

The memorandum stated that

5. The relative economics of b., c. and d. would require further study. Operationally, the daybeacon would be preferable to the riprap; but construction costs of a structure capable of withstanding the wind and sea action in this locality *may be* relatively expensive. [Emphasis added.]

On October 25, 1965, a new position was established for the buoy at 100 yards, 315° True from the wreck remains as a result of the request of Congressman Hastings Keith

that the Coast Guard reevaluate the position of the buoy relative to the remains of the wreck.

On August 30, 1969, the buoy marking the wreck was replaced by a smaller buoy [3] with a visual range of one mile. This buoy was designed to be used in a sheltered area, with a minimum water depth of 10 feet, and a maximum of 200 feet. It had a draft of 4 feet 9 inches, a height of 3 feet 6 inches, and required a 3000-pound sinker to moor it. The depth of the water at this location is 15 feet. At the time of the accident, the buoy was on station.

On October 24, 1969, Mr. Crosby, writing as Chairman of the Waterways Committee, requested the Coast Guard "to install a day mark or some suitable structure to mark the wreck" since "[e]ven though a buoy marks the location, it is so far away that no one realizes just where the wreck is."

In a letter dated November 7, 1969, the Chief of the Aids to Navigation Branch for the First U. S. Coast Guard District, Captain R. J. Dahlby, by order of the Commander, denied the request for a daymark, noting that "[a]lthough a fixed daymark would better mark the wreck, it would be prohibitively expensive and of questionable value." This letter also referred to the area in question as "inherently dangerous."

II.  *The Accident.*

Between 7:00 a. m. and 8:00 a. m. on September 30, 1971, Dr. Robert L. Baxter (aged 69); his wife; John Ohrn (aged 34); and the decedents, Dr. James L. Chute (aged 75) and Harlan L. Matthews (aged 77), departed from Lewis Bay on the AD LIB II and proceeded to Nantucket Sound to fish. The AD LIB II had a length of 24 feet, a width of approximately 10 feet, a mean draft of 3 feet, and a fiberglass hull. Dr. Baxter was an experienced mariner in

---

**3.**  Captain Thompson of the United States Coast Guard testified as to the description of the buoys and their location. As of September, 1971, he was the Chief of the Aids to Navigation, First District Office of the U. S. Coast Guard, stationed in Boston. He stated that the Coast Guard continually reviews the size of the

aids to navigation "with the idea that we use the smallest aid possible to mark an area. This is because of the danger inherent in handling heavy weights that we would use as light a weight buoy as we could." Tr. Vol. 1 at 37–38 (Dec. 17, 1976).

the Nantucket Sound area, having fished in the area for some 40 years. He had also taught local courses in navigation and therefore knew that a wreck buoy is not placed on top of a wreck.

At approximately noon, the boating party decided to head toward home. The weather was "hazy; not foggy." Tr. Vol. 1 at 4 (Dec. 17, 1976). The vessel was in the vicinity of Horseshoe Shoals somewhat south of the location of the wreck.[4] Dr. Baxter was at the helm and headed the vessel in a north-northeast course on a heading of 30° magnetic at a speed of 14 knots. At this speed the boat was semi-planing. Dr. Baxter observed the tower on the hill at Hyannis Port and decided that his course would take him back to Hyannis. Shortly after choosing his course, Dr. Baxter expressed surprise at the shallow depth of the water. Moments later, a sound was heard indicating the vessel had struck something. One of the party went below to check the hull and discovered a break in the fiberglass skin on the starboard side which was then stuffed with rags.

No one on the AD LIB II saw precisely what the boat struck. The plaintiffs claim the boat hit the wreck of the PC1203 which could not be seen since it was under the water. The defendant contends that the AD LIB II did not hit the wreck, but hit Horseshoe Shoals themselves. After careful consideration of all the evidence presented at trial, the court finds that the AD LIB II sunk as a result of hitting the wreck, and not the shoals.

The court first points to the admission to this effect contained in the letter of No-vember 4, 1971 from Lieutenant Commander Boyce to Mr. Fallon which has already been discussed, *supra,* in this court's Evidentiary Rulings. As additional support for their claim regarding causation, plaintiffs offered evidence on the nature of the sea bottom in the area of the accident as indicated on the navigational chart possessed by Dr. Baxter and placed into evidence by the defendant, as well as the nature of the damage to the hull of the AD LIB II. The designation on the chart which is closest to the location of the accident is *"hrd"* which, according to the chart's key, indicates "hard", and according to plaintiffs' argument, hard sand. This is distinguishable from the designation somewhat northwest of the accident area which is "rcky", meaning rocky bottom. While the plaintiffs' witness, Captain Hall, a retired professional yacht captain who was very familiar with Nantucket Sound, testified that the accident area did have some rocks and stones,[5] he testified that he had occasion to observe the hull of a fiberglass vessel that had struck a shoal comprised of hard sand (Tr. Vol. 2 at 20, Dec. 16, 1976), and that such an impact would not ordinarily leave "deep gouge marks that penetrate the surface through into the interior of the vessel."[6] Tr. Vol. 2 at 20 (Dec. 16, 1976). Moreover, if the boat actually hit rocks, he would "expect them to severely bruise a large area of the hull," although this would not necessarily open up the hull since "[i]t [presumably the rock] might just bounce off it [presumably the hull]."[7]

Yet the evidence submitted with regard to the type of damage to the AD LIB II's hull demonstrated that the port[8] side had a

---

4. The AD LIB II's location at this time was determined on the basis of Dr. Baxter's navigational experience and familiarity with the movement of the waters in the area. Tr. Vol. 1 at 6 (Dec. 17, 1976).

5. In response to questioning by plaintiffs' counsel, Captain Hall stated:

   For the most part, Horseshoe Shoals, as I think you can read from the chart, is composed of sand. However, there are areas of gravel. There are areas of stone. I know of no large rocks above the surface, but there

certainly are stones three times as big as your head [on the bottom and underwater].

6. The quoted words are those of plaintiffs' counsel in questioning Captain Hall.

7. The phrase "[i]t might just bounce off it" was that expressed by the government's counsel in questioning Captain Hall.

8. Dr. Baxter's testimony was somewhat confusing as to whether the gash was on the port or starboard side. In his earlier testimony, Dr. Baxter had stated that immediately after impact he observed "a break in the fiberglass skin a

tremendous gash in it. Tr. Vol. 1 at 18 (Dec. 17, 1976). Additionally, the defendant's own witness, Commander Nigro, the Coast Guard officer who investigated the sinking of the AD LIB II, conceded in his testimony that the AD LIB II probably hit the wreck. Tr. Vol. 2 at 31–32 (Dec. 16, 1976).[9]

After the AD LIB II struck the wreck, the decision was made to "try to make it" back to shore. However, the boat was taking on a lot of water and subsequently Dr. Baxter turned the AD LIB II toward the shoal, hoping to be in shallow waters. While in the turn, however, the boat sank and the parties were forced into the water.

To stay afloat, all persons put on life jackets. Additionally, Dr. Baxter had constructed an ice chest which was capable of floating. A rope was tied to the ice chest and then to each of the passengers except Mr. Ohrn who decided to try to swim to the wreck buoy, some two to three hundred yards away from where the AD LIB II sank. Dr. Baxter was closest to the ice chest; Mrs. Baxter was next; Mr. Matthews next to her; and then Dr. Chute. Some time later, Mr. Matthews swallowed some water and regurgitated, and shortly thereafter the others heard him "snoring." Dr. Chute checked Mr. Matthews' pulse and found he had none. The cause of death subsequently stated on the death certificate was drowning.

At approximately 4:30 p. m., after drifting for some four hours, the group, including Mr. Matthews, was picked up by the C/C JOHNNY B IV. The owner of that boat called the Coast Guard which dispatched its own boat, the POINT TURNER, and a helicopter. The group was then taken aboard the Coast Guard vessel. Dr.

Chute was considered injured and the helicopter was to airlift him to a hospital. However, Dr. Chute was reluctant to go and the captain of the POINT TURNER did not force him to go. Dr. Chute was taken ashore by the POINT TURNER where he was met by an ambulance which drove him to Falmouth Hospital. He died the next morning at the hospital—cause of death, according to the death certificate, being "coronary insufficiency following immersion and exhaustion after boat accident at sea."

Subsequent to the accident, in October, 1971, the Coast Guard received a letter from Mr. Crosby requesting the dynamiting of the PC1203 remains. In letters dated October 13, 1971 and November 4, 1971, the Coast Guard informed Mr. Crosby and Mr. Fallon that the Coast Guard had decided to have the PC1203 remains blown up. These letters have already been discussed in the court's Evidentiary Rulings, *supra.* The wreck was accordingly demolished. The Coast Guard had not made any feasibility studies to determine the cost of dynamiting the wreck prior to September 30, 1971, the date the AD LIB II sank.

## CONCLUSIONS OF LAW

■ The Suits in Admiralty Act constitutes a waiver of the sovereign immunity of the United States for certain maritime claims against the federal government. *Gercey v. United States, supra,* 540 F.2d at 539. Although the Suits in Admiralty Act does not contain an express exception for harm resulting from the exercise of "discretionary functions" as does the Federal Tort Claims Act, 28 U.S.C. § 2680(a), such a limitation on the waiver of sovereign immu-

on the starboard side" and no damage to the port side. Tr. Vol. 1 at 8 (Dec. 17, 1976). See p. 179, *supra.*

9. The defendant notes that the state boating accident report admittedly signed by Dr. Baxter states that the cause of the accident was unknown. However, the report does state, in describing what occurred, that the AD LIB II "collided with the wreck—located on southern end of Horseshoe Shoal." Presumably, this refers to the PC1203 wreck. The report also

indicates that the weather at the time of the accident was clear, contrary to Dr. Baxter's testimony that it was hazy. The report was filled out by a Mr. McSorley, the State Boating Inspector for the Commonwealth of Massachusetts. In view of the evidence discussed above, and despite this report, the court concludes that the plaintiffs have met their burden in showing that the AD LIB II sank as a result of striking the PC1203 wreck.

nity must be implied. *Id.* The First Circuit has defined the "discretionary functions" exception as

> a category which includes, and probably should be limited to, basic "policy judgments as to the public interest." *See Griffin v. United States*, 500 F.2d 1059, 1064 (3d Cir. 1974); K. Davis, Administrative Law Treatise § 25.08 (1976 Supp.).

*Id.* However, even assuming that the duty to mark the wreck of the PC1203 was within the discretion of the Coast Guard, the government may be liable since "there is liability for negligence in marking after the discretion has been exercised and the decision to mark has been made." *Somerset Seafood Co. v. United States*, 193 F.2d 631, 635 (4th Cir. 1951).[10] *Greer v. United States*, 505 F.2d 90, 92 (5th Cir. 1974); *see also, United Air Lines, Inc. v. Weiner*, 335 F.2d 379, 393 (9th Cir.), *cert. dismissed sub nom., United Air Lines, Inc. v. United States*, 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549 (1964).

In *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), the Supreme Court held the government liable under the Federal Tort Claims Act for the negligent maintenance of a lighthouse which resulted in damages when a tug towing a barge went aground. The precise issue confronted by the Court was the propriety of a governmental-non-governmental function distinction as a basis for liability under the Federal Tort Claims Act. The government had conceded that the discretionary function exception of that statute was not therein involved. Nevertheless, the Court's language is instructive. The Court stated at page 69, 76 S.Ct. at page 126 that

> The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light on Chandeleur Island and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in

good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning. If the Coast Guard failed in its duty and damage was thereby caused to petitioners, the United States is liable under the Tort Claims Act.

In *United States v. Sandra & Dennis Fishing Corp.*, 372 F.2d 189 (1st Cir.), cert. denied 389 U.S. 836, 88 S.Ct. 48, 19 L.Ed.2d 98 (1967), a case involving an unsuccessful Coast Guard rescue and tow operation, the court discussed the extent of the obligation which the Coast Guard owed to the claimants under 46 U.S.C. §§ 741–752, 781–790 and the principles of *Indian Towing.*

> The case of *Indian Towing, Inc. v. United States*, 1955, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48, upon which claimants place principal reliance, did not impose liability upon the government because the Coast Guard maintained insufficient equipment—there navigational aids—per se, but because it failed to maintain a particular aid after the plaintiff had been led to believe it could rely on it. How much equipment the Coast Guard is to possess, and how much money it is to spend, measured, necessarily, by Congressional appropriations, must be for the government's uncontrolled discretion. We can recognize no obligation upon the government either to have . . . [a particular vessel] available, or to have had on board any particular equipment. [Citations omitted.]
>
> \*   \*   \*   \*   \*   \*
>
> What we do recognize is precisely in accord with the principle laid down in *Indian Towing*, namely, that the government must not mislead, and must not induce reliance upon a belief that it is providing something which, in fact, it is not providing. . . . By its silence

---

**10.** This was an alternate holding by the court. The court first concluded that the duty of the United States to mark or remove the wreck is mandatory under the Wrecks Act. "The appropriate federal agencies and officers decide merely the proper methods or measures." 193 F.2d at 635.

when it accepted the mission it must be found that the Coast Guard led . . . [the claimants] to believe that the . . [rescuing Coast Guard vessel] was reasonably capable of performing the task. . . or, to put it another way, the silence was an undertaking that . . . [the Coast Guard] would perform its functions with reasonable care.

*Id.* at 195.

The plaintiffs argue that the manner in which the Coast Guard marked the wreck of the PC1203 misled the AD LIB II as to the wreck's location which caused the yacht to collide with the wreck and sink with the attendant loss of life. The plaintiffs maintain that the Coast Guard, having chosen to warn mariners of the danger posed by the wreck of the PC1203 by the erection of a buoy, had an obligation either to more adequately mark the wreck's location by means of a fixed daymark placed closer to the actual wreck or to remove the wreck entirely.

The government disclaims liability for the following reasons. First, it asserts that the AD LIB II struck the shoals and not the wreck of the PC1203. The court has already disposed of this argument in its factual findings, *supra*. Second, even if the AD LIB II sank as a result of striking the PC1203 wreck, the government maintains that such a collision was the result of the negligence of Dr. Baxter or other persons for which the government is not responsible. These "other persons" have never been identified. Finally, the government argues that the manner chosen by the Coast Guard to mark the wreck was within the discretionary function exception to the waiver of sovereign immunity, that the manner so chosen did not mislead anyone, including Dr. Baxter, and that in view of the funding and equipment available to the Coast Guard, the buoy actually erected was the most appropriate navigational aid employable under the circumstances. After reviewing the evidence and analyzing the applicable authorities, this court concludes that the government is liable for the sinking of the AD LIB II and the deaths of Mr. Matthews and Dr. Chute.

The court rejects the defendant's contention that Dr. Baxter's negligence was the cause of the sinking of the AD LIB II.[11] The government argues that Dr. Baxter failed to keep a proper lookout and that in view of the location of the boat at the time of the accident, he operated the AD LIB II in a negligent manner, including proceeding at an excessive speed. I agree with the government that Dr. Baxter had a duty to "maintain a careful and efficient lookout." *Dahlmer v. Bay State Dredging & Contracting Co.*, 26 F.2d 603, 605 (1st Cir. 1928); *Harris v. Newman*, 404 F.Supp. 947, 951 (S.D.Miss.1975), 33 U.S.C. § 221. However, the evidence does not support the conclusion that such a lookout was not maintained. The fact that Dr. Baxter was an experienced navigator in the vicinity of Horseshoe Shoals and familiar with the principle that wreck buoys are not placed directly on top of wrecks, does not necessarily mean that Dr. Baxter should have seen the wreck buoy and therefore should have known precisely where the remains of the PC1203 were located. This is not the kind of situation where Dr. Baxter's admitted failure to see the wreck buoy constitutes negligence on his part. *Jett v. Texas Co.*, 73 F.Supp. 699, 706 (D.Del.1947); *Sun Oil Co. v. SS Georgel*, 245 F.Supp. 537, 545 (S.D.N.Y.1965), *aff'd* 369 F.2d 406 (2nd Cir. 1966). The accident area was one that was subject to rips or swells which could easily have concealed a buoy which was only some three and one-half feet above the water's surface. Dr. Baxter testified[12] that he did not see the buoy and, had he seen it, he would have altered his course. Tr. Vol. 1 at 23 (Dec. 17, 1976). Dr. Baxter was thus forced to rely to his detriment upon the

11. The court similarly rejects the government's contention that persons other than Dr. Baxter are liable for the sinking of the AD LIB II, since the government has failed to even identify who such persons might be.

12. In view of Dr. Baxter's age, the parties agreed that he would testify by deposition.

absence of the wreck buoy, "the one 'landmark' which would not only pinpoint his location but also pinpoint the one known hazard in the area." Plaintiffs' Reply Brief at 18. In view of this situation, the court cannot conclude that Dr. Baxter's failure to see the buoy was the result of his failure to maintain a proper lookout.

The government points to the fact that the AD LIB II was semi-planing at the time of the accident and traveling at a rate of 14 knots. It contends that proceeding in such a fashion was negligent in view of Dr. Baxter's knowledge of the existence of the shoals and the wreck buoy somewhere in the area. This evidence alone, however, is insufficient to support the conclusion that the vessel's speed was excessive or that Dr. Baxter was otherwise operating the AD LIB II negligently.

The government also presented evidence that, as a result of feeling ill the night before the fatal accident, Dr. Baxter had lost sleep. It thus argues that his alertness the next day was diminished. This court is not persuaded, however, that there is any causal connection between Dr. Baxter's health condition the previous night and the accident. No evidence was submitted indicating that prior to the accident Dr. Baxter had any difficulty or showed any signs of inattentiveness.

Unlike several of the cases cited by the defendant, the AD LIB II was adequately equipped, *McMilin v. United States*, 290 F.Supp. 351 (D.Del.1968), and Dr. Baxter did not knowingly proceed into a danger area where he had actually observed buoys warning of danger. *Brewer v. E. J. Platt Fisheries, Inc.*, 511 F.2d 182 (5th Cir. 1975).

Both parties acknowledge that the wreck was not located in a marked navigable channel. Plaintiffs contend, however, that the area was one frequented by pleasure boats and fishermen [13] and that the government had actual knowledge of such usage. Additionally, plaintiffs argue that "navigable channels" as used in the statute

"has not been construed to confine the Act [33 U.S.C. § 409] to the dredged, buoy marked channels to which commercial vessels are largely confined." *Lane v. United States*, 529 F.2d 175, 179 (4th Cir. 1975). This court, however, need not resolve the extent to which the Coast Guard was obligated to mark a wreck located on Horseshoe Shoals since the Coast Guard itself already made that decision. Having once decided to mark the PC1203, it had to do so reasonably, whether or not the PC1203 was located in a "navigable channel."

The plaintiffs concede that the wreck buoy involved in the present case was on station and could not have been located closer to the PC1203 remains. They argue, however, that the wreck of the PC1203 could not and was not adequately marked by a buoy. They assert that in order to properly warn mariners of the danger posed by the wreck, the Coast Guard should have either installed a daymark, which could have been erected closer to the wreck than the buoy, or completely demolished the PC1203 remains.

The Coast Guard argues that the method chosen to mark the PC1203 wreck was wholly within the discretion of the Coast Guard and thus the government is not liable for any inadequacies in the method so chosen. The government notes that the statute governing the marking of wrecks only requires that such marking be done by a "buoy *or* beacon." 33 U.S.C. § 409 (emphasis added). The Coast Guard maintains that it was therefore within the government's discretion to choose whether to mark the PC1203 wreck with a buoy or a beacon. The court disagrees with this interpretation of the statutory language. The mere fact that such language allows a wreck to be marked with a "buoy or beacon" does not give the Coast Guard free reign to choose the method which is merely more convenient or less expensive. Rather, the more reasonable interpretation of this

13. There could be approximately 60 to 100 such boats in the area per day from 1963 to 1971.

language is that the method used should be the one most appropriate under the circumstances of a particular case. It is therefore necessary to examine the circumstances surrounding the case at bar.

The Coast Guard, in its answer of October 28, 1965 to Congressman Keith's inquiry regarding the buoy's location, stated "[i]deally the buoy should be directly over the wreck, but this is not possible because of the danger to the servicing vessel." This point is apparently not disputed by the parties. As to the erection of a beacon or daymark, the Coast Guard correspondence with Mr. Crosby dated November 7, 1969 indicates it considered the cost prohibitive. This sentiment was reiterated by Captain Thompson of the Coast Guard, see note 3, *supra*, who testified at trial by way of deposition that "a [fixed] marker in this particular area is not cost-effective." Tr. Vol. 1 at 41 and Vol. 2 at 36–37 (Dec. 17, 1976).[14] Arguing that the Coast Guard could not be required to make such an unwarranted expenditure, the government maintains that the availability of the funds and equipment necessary to erect a daymark "must be for the government's uncontrolled discretion," citing *United States v. Sandra & Dennis Fishing Corp., supra*, 372 F.2d at 195.

Plaintiffs' expert, Captain C.G. Houtsma,[15] disagreed with the government's evaluation of the feasibility of erecting a daymark and asserted that a daymark could be established immediately adjacent to the PC1203 wreck by a process which he described in detail known as "jetting a pile." Additionally, the daymark is generally about 15 feet high (above the water), whereas, as already noted, the buoy placed by the Coast Guard was only some three and one-half feet high (above the water). Tr. Vol. 1 at 87 (Dec. 17, 1976). Through extensive testimony, Captain Houtsma explained that the erection of a daymark, while concededly prohibitively expensive if done commercially by a private nongovernment contractor, Tr. Vol. 1 at 92 (Dec. 17, 1976), could be done manageably by the use of standard Coast Guard equipment which was readily available during the period in question and with approximately half the number of men required to service a buoy. Tr. Vol. 1 at 79, 81 (Dec. 17, 1976). The Coast Guard admitted that at the time of the accident it had a vessel available, a 45-foot flat bottom vessel with a draft of three feet, which Captain Houtsma believed could adequately perform the "jetting" procedure. Tr. Vol. 1 at 72–73 (Dec. 17, 1976).

The government attempted to discredit Captain Houtsma's opinion by introducing the memorandum to the Coast Guard Commandant, dated October 22, 1965, which was signed by Captain Houtsma while he was actually in the Coast Guard. See p. 176, *supra*. While, at first glance, this memorandum raises some question as to the validity of Captain Houtsma's opinion concerning the feasibility of erecting a daymark, the memorandum does not preclude the conclusion which Captain Houtsma expressed at trial. Captain Houtsma insisted the memorandum merely raised the importance of exploring alternatives to the buoy marking then in existence and that his opinion stated at trial was therefore not inconsistent with that expressed in the memorandum. Unfortunately, the need to explore those alternatives was ignored. The memorandum was only a tentative analysis. The fifth paragraph specifically

14. Captain Thompson identified the following factors as those which he would consider in determining the suitable method of marking the wreck: depth of the water over the wreck, location of the wreck, location of other aids in the vicinity, normal routes of navigation in the area, and the geographical conditions. Tr. Vol. 1 at 34–35 (Dec. 17, 1976).

15. Captain Houtsma retired from the Coast Guard after some 29 years of service. He holds a degree in naval engineering from Massachusetts Institute of Technology. He has had con-

siderable experience in the Aids to Navigation Section of the Coast Guard, particularly with regard to the inner coastal waterway. As a result of his duties, he has spent time on buoy tenders and observing them function and has had experience in pile driving and jetting piles and the construction of daymarks. Captain Houtsma was familiar with Nantucket Sound. While assigned to the Boston Coast Guard office, he served as Operation Officer and as Chief of Staff.

calls for "further study" of the alternatives. The memorandum does not rule out the erection of a day beacon as being prohibitively expensive since it merely states that such an endeavor *may* be *relatively* expensive. Additionally, the court notes that despite the apparent satisfaction with the buoy's location which is expressed in the memorandum, the buoy was in fact moved closer to the wreck within days of the date of that document. This lends support to the contention that the memorandum's analysis was somewhat tentative and that it called for the exploration of alternatives before any final decision was rendered. I find Captain Houtsma's testimony at trial persuasive and conclude that the PC1203 wreck could and should have been marked by a daymark rather than a buoy in order to more adequately safeguard the boating public.

█ However, even if this court were to conclude that the erection of a daymark by the jetting process was not feasible or cost-effective as the Coast Guard maintains, I would still find the Coast Guard liable for negligence in marking the PC1203 wreck by means of a buoy located 100 yards away. This is because the Coast Guard could and should have completely demolished the PC1203 remains in order to properly carry out the duty it had undertaken to protect mariners from the hazard posed by the wreck. That such demolition was feasible is demonstrated by the fact that it was actually done subsequent to the accident. Nothing presented to this court indicates that circumstances were any different before the accident than after it so as to have prevented the earlier demolition. Moreover, the evidence showed that the Coast Guard did not even inquire as to the feasi-

bility of blowing up the PC1203 remains prior to the sinking of the AD LIB II.

Finally, this court wishes to comment on the defendant's reliance on the First Circuit's decision in *Gercey v. United States, supra.* Such reliance is misplaced. *Gercey* involved a wrongful death action brought under the Suits in Admiralty Act and based on the drowning of the plaintiffs' son when a private vessel broke apart and sank. In *Gercey*, the government had revoked the certification of the vessel without which the vessel could not lawfully carry six or more persons for hire as it had done. The plaintiffs argued that the Coast Guard had "a statutory or common law duty to take reasonable steps to protect the fee paying public from vessels which the Coast Guard has refused to certify and which it knows to be unsafe." *Id.* at 537. In *Gercey*, the question involved was whether the government had an obligation to undertake a particular task, namely notifying the public of its certification decision. In contrast, in the present case, the government has already chosen to undertake a particular task— warning mariners of the location of a dangerous obstacle to navigation. The complaint of the plaintiffs at bar is founded on the method or manner chosen to carry out that decision.[16]

█ In summary, this court finds the defendant, the United States, liable for the sinking of the AD LIB II and the deaths of Mr. Matthews and Dr. Chute because of defendant's negligent marking of the remains of the PC1203. "That more precise marking was required is clear in the light of the intentional sinking of the ship [the PC1203] and the reduction of its visible parts." *Thomson v. United States*, 266 F.2d

---

**16.** In *Gercey*, the First Circuit stated:

[T]he Coast Guard's alleged negligence lies in failing to adopt a policy of taking positive steps to protect the public from vessels whose certificates have been revoked, not in imperfectly executing a federal program established either by an act of Congress or a federal regulation. *Compare Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), *and Coastwise Packet Co. v. United States*, 398 F.2d 77 (1st

Cir. 1968). . . . Although we agree with plaintiffs that the Coast Guard has discretionary authority to adopt such a follow-up program, *it has not done so.* [Emphasis added.]

The decision whether to institute such a policy, in our view, involves a basic policy judgment as to how the public interest may best be promoted.

540 F.2d at 538.

852, 854 (4th Cir. 1959). Once the Coast Guard chose to exercise its discretion to warn mariners of the danger posed by the wreck, it had an obligation to do so properly. Placing a buoy only rising some three and one-half feet above waters known to be subject to swells and positioned approximately 100 yards away from the actual wreck did not satisfy this obligation. The Coast Guard should have either erected a daymark rising some 15 feet above the water immediately adjacent to the wreck or demolished the PC1203 remains completely. Having failed to do either, the government must be held liable for the sinking of the AD LIB II and the tragic deaths of two of its passengers.[17]

17. Additionally, because the court concludes that the plaintiffs have proven their case, the defendant's motion for judgment in its favor, made at the close of plaintiffs' case, is denied. The court suggests that the parties take the next sixty (60) days to decide whether there is any opportunity to settle this case on the issue of damages. Failure to do so will result in the court's marking the case for a hearing on damages.