Michael B. GERCEY et al.,
Plaintiffs-Appellants,

v.

UNITED STATES of America,
Defendant-Appellee.

No. 76–1137.

United States Court of Appeals,
First Circuit.

Argued June 3, 1976.
Decided Aug. 19, 1976.

Abraham Goldstein, Providence, R. I., for appellants.

Mark N. Mutterperl, Atty., Appellate Section, Civ. Div., Dept. of Justice, with whom Rex E. Lee, Asst. Atty. Gen., Washington, D. C., Lincoln C. Almond, U. S. Atty., Providence, R. I., and Robert E. Kopp, Atty., Appellate Section, Washington, D. C., Dept. of Justice, were on brief for appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

Plaintiffs-appellants are the parents of Steven Gercey, who drowned when the motor vessel COMET sank off Port Judith,

Rhode Island on May 19, 1973. They instituted this wrongful death action against the United States under the Suits in Admiralty Act, 46 U.S.C. §§ 741–52,[1] alleging that the Coast Guard had, by its negligence, caused their son's death. They contended that the Coast Guard had revoked the COMET's certificate to operate as a "passenger-carrying vessel" because it found the vessel to be unsafe, but that it failed to take positive, feasible steps to protect individuals like their son from the danger of voyaging on the vessel. The district court, on the basis of the pleadings and proposed findings of fact, granted defendant's motion for judgment on the pleadings, holding that plaintiffs had failed to allege that defendant's negligence was a cause-in-fact of decedent's death. 409 F.Supp. 946 (D.R.I. 1976). We affirm, although on a different ground.

The facts are relatively few and undisputed. The COMET, a 30 year old, 49 foot wooden motor vessel, capable of carrying up to 39 passengers, failed to pass the Coast Guard inspection in 1971, principally because its hull was found to be rotten. The Coast Guard accordingly removed its certificate to operate as a passenger carrying vessel. Without this certificate the COMET could not lawfully carry six or more passengers for hire, see 46 U.S.C. § 390c, and, if it were to do so, it and its master would be liable for up to $1000 in fines. See id. § 390d. The lack of such a certificate, however, does not preclude a vessel from otherwise operating lawfully.

Following the revocation of the COMET's certificate, plaintiffs allege that the Coast Guard took absolutely no follow up measures to protect the fee paying public from the danger of riding on the vessel. According to plaintiffs, the sole action taken by the Coast Guard was to remove the certificate from the COMET—a 4" by 6" piece of paper which presumably had been displayed "in a conspicuous place in the vessel where it [was] most likely to be observed by passengers", see id. § 400—and file it in Washington.

In the fall of 1971, the COMET was sold to one William Jackson, who, possibly out of ignorance of both the condition of the vessel and the requirements of federal law, proceeded to carry large groups of fee paying passengers on it during 1972 and 1973. During this period, the COMET made trips to and from the port of Galilee, at the head of which was a Coast Guard station. The record reflects that no Coast Guard personnel were aware either of the vessel's movements or that it had been decertified. On May 19, 1973, Jackson took a large group of fee paying passengers, including decedent, on a fishing trip off the coast of Rhode Island. Although the weather and sea conditions were alleged to be quite normal, the COMET, some five miles off the coast, split in two and sank. Decedent, Jackson, and fifteen other passengers perished.

The theory upon which plaintiffs seek to recover can be stated simply: they maintain that the Coast Guard is under either a statutory or common law duty to take reasonable steps to protect the fee paying public from vessels which the Coast Guard has refused to certify and which it knows to be unsafe. Plaintiffs list half a dozen actions which they allege the Court Guard could easily have taken and which, in their view, would have substantially increased the likelihood that fee paying passengers like their son would not have voyaged on the COMET. These include: (1) informing the public of the condition of all such vessels by either a public notice or a sign placed on the vessel; (2) periodically checking to determine if such vessels are being used contrary to § 390c; (3) informing any new purchaser of the condition of the vessel; and (4) notifying all local Coast Guard units which vessels are decertified. Although the district court thought it unlikely that the Coast Guard could be held liable in tort for injuries proximately caused by its failure to

---

1. The case was originally brought under the Federal Tort Claims Act, 28 U.S.C. §§ 2671–80, but the district court, relying upon *Roberts v. United States*, 498 F.2d 520 (9th Cir. 1974), treated it as arising under the Suits in Admiralty Act. *See also Beeler v. United States,* 338 F.2d 687 (3rd Cir. 1964). Neither party challenges this ruling upon appeal.

take these measures, it did not reach this issue. It held instead that the plaintiffs could not recover since they had not claimed that the Coast Guard's alleged negligence was a cause-in-fact of their son's death. This we think was error.

 In deciding that plaintiffs had failed to allege a sufficient causal connection between the alleged acts of nonfeasance and decedent's death, the district court applied too stringent a standard. It apparently believed that plaintiffs could not go to the jury on the issue of causation-in-fact unless they alleged that the implementation of the measures they propose would have prevented the COMET from sinking with fee paying passengers aboard. This is too harsh a test. Causation-in-fact is almost always a jury question. To survive a motion for judgment on the pleadings, plaintiffs need only have shown that reasoning minds could conclude that the Coast Guard's alleged misconduct was a substantial factor in producing plaintiffs' injury—which was not the sinking of the vessel per se, but their son's death. See W. Prosser, Handbook of the Law of Torts 289 (4th ed. 1971). Plaintiffs clearly made this showing. Reasonable men could conclude that, if the Coast Guard had performed but one of the measures plaintiffs suggest—requiring that decertified vessels display notices informing the public of its condition—decedent probably would not have gone aboard the vessel and, thus, would not have drowned.[2] Although we understand why the principles of judicial economy and restraint led the district court, when faced with the novel question of the Coast Guard's liability, to prefer this narrow ground of decision, we believe we must reach the broader question of the Coast Guard's liability.

 In addressing this question, we note at the outset that the Coast Guard's alleged negligence lies in failing to adopt a policy of taking positive steps to protect the public from vessels whose certificates have been revoked, not in imperfectly executing a federal program established either by an act of Congress or a federal regulation. Compare Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) and Coastwise Packet Co. v. United States, 398 F.2d 77 (1st Cir. 1968). Neither the Congress nor the Coast Guard has explicitly required that positive action be taken to protect the public from such vessels. Congress has mandated only that the Coast Guard periodically conduct certain types of inspections of passenger carrying vessels, see 46 U.S.C. §§ 390a, 391, revoking the certificates of vessels which fail to meet federal requirements. Id. §§ 390c(c), 391. Although Congress plainly contemplated that the Coast Guard would take certain specific measures to induce compliance with federal law, see id., §§ 390d, 435, it neither expressly nor by necessary implication imposed a duty upon the Coast Guard to devise, fund, staff, and implement the kind of follow-up system which plaintiffs believe is required by ordinary prudence. Although we agree with plaintiffs that the Coast Guard has the discretionary authority to adopt such a follow-up program, it has not done so.

The decision whether to institute such a policy, in our view, involves a basic policy judgment as to how the public interest may best be promoted. The Coast Guard has limited resources and a myriad of regulatory responsibilities. A determination whether it would be in the public interest to make a major commitment of the Coast Guard's resources to the creation of a follow-up system would require consideration of a host of factors: how effective the present enforcement measures—whatever they are—have been; how much more protection would be afforded the fee paying public if such a system were created; and, finally, whether the increased protection would be sufficient to warrant both the commitment of the Coast Guard's resources

2. Defendant suggests that the district court's decision was based upon the plaintiffs' failure to allege specifically that this type of causal connection existed. Such a position seems to us unduly technical and contrary to the directive that pleadings be construed to do "substantial justice." Fed.R.Civ.P. 8(f).

and the possible diversion of such resources from other regulatory activities.[3]

We need not attempt to strike the balance between these perhaps competing interests. The critical question for our consideration is not whether we agree with the plaintiffs' contention that ordinary prudence requires that the Coast Guard take broad, positive measures to protect the fee paying public from decertified vessels. Rather, it is whether a federal court has the power to impose liability on the Coast Guard for failing to make, and implement, the basic policy decision that the public interest requires its limited resources be committed to such a program. We conclude that we have not been conferred that power by the Suits in Admiralty Act.

■ The Suits in Admiralty Act, of course, effects a waiver of the sovereign immunity of the United States for certain maritime claims against the United States. Unlike the Federal Tort Claims Act, see 28 U.S.C. § 2680(a), the Suits in Admiralty Act does not contain an express exception for harm caused by the exercise of "discretionary functions", a category which includes, and probably should be limited to, basic "policy judgments as to the public interest". See *Griffin v. United States*, 500 F.2d 1059, 1064 (3d Cir. 1974); K. Davis, Administrative Law Treatise § 25.08 (1976 Supp.). Although the Suits in Admiralty Act contains no express exception, we think that sound principles demand that the act be construed as subject to such discretionary function exception.[4] See K. Davis, *supra*, § 25.13 (1958 ed. & 1970 Supp.); L. Jaffe, Judicial Control of Administrative Action, 244 n. 43 (1965). Compare *King v. Seattle*, 84 Wash.2d 239, 525 P.2d 228 (1974). Were there no such immunity for basic policy making decisions, all administrative and legislative decisions concerning the public interest in maritime matters would be subject to independent judicial review in the not unlikely event that the implementation of those policy judgments were to cause private injuries. That, in our view, would be an intolerable state of affairs, see *United States v. Sandra & Dennis Fishing Co.*, 372 F.2d 189, 195 (1st Cir. 1967), and we decline, in the absence of an express Congressional directive to the contrary, to construe this waiver of sovereign immunity as providing the federal courts with that power. Accordingly, we refuse to consider imposing liability on the Coast Guard for failing to adopt a comprehensive program of protecting the public from decertified vessels.

*Affirmed.*

---

3. The magnitude of this tragedy prompts us to observe that there may be measures short of a comprehensive follow-up system which might, at little cost, avert some disasters. For example, if Coast Guard stations were advised of passenger carrying vessels which had recently been decertified, officials might be able to identify obvious violators within their area of surveillance. We would hope that the events giving rise to this case would prompt a search for feasible means to lessen the likelihood of their reoccurrence.

4. This is only the second time, to our knowledge, that a court has addressed the question whether a "discretionary function" exception should be implied under the Suits in Admiralty Act. We earlier assumed, without discussion, that such an exception did apply to the act. See *Boston Edison Co. v. Great Lakes Dredge & Dock Co.*, 423 F.2d 891 (1st Cir. 1970). A second court, however, has taken a contrary position, see *De Bardeleben Marine Corp. v. United States*, 451 F.2d 140, 146 & n. 15 (5th Cir. 1971) (dictum), relying on cases holding that operating a man-of-war, which in the court's view was surely discretionary, could subject the United States to liability under the act. The validity of this conclusion depends on the premise that operating a vessel is a "discretionary function" within the meaning of that exception to the waiver of sovereign immunity. Our view is that, like fighting a fire, see *Rayonier, Inc. v. United States*, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957), operating a vessel does not involve a basic policy judgment of how best to promote the public interest and, as such, is not a "discretionary function". So viewing the premise in *De Bardeleben Marine Corp.*, we cannot accept the court's conclusion.