Alfred J. RAPPENECKER, Albert Minichiello, Darryl V. Kastl, Frank Conway, and Raymond Paul Friedler, Jr., Plaintiffs,

v.

UNITED STATES of America, Defendant.

Carol A. SCHMIDT, As Administratrix of the Estate of Earl C. Gilbert, Plaintiff,

v.

UNITED STATES of America, Defendant.

Juan P. SANCHEZ and Wilbert N. Bock, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Francis PASTRANO, Plaintiff,

v.

UNITED STATES of America, Defendant.

Nos. C–76–0298–WWS, C–76–0422–WWS, C–77–0565–WWS and C–77–0939–WWS.

United States District Court,
N. D. California.

July 8, 1980.

See also, D.C., 509 F.Supp. 1018.

Martin J. Jarvis, Jarvis, Miller, Brodsky & Baskins, Inc., San Francisco, Cal., for plaintiffs.

G. William Hunter, U. S. Atty., Philip A. Berns, Warren A. Schneider, Attys., Torts Branch, Civil Division, Dept. of Justice, San Francisco, Cal., John Perruzzi, Defence Mapping Agency, William E. Gwatkin, III, Admiralty & Shipping Section, U. S. Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OF OPINION AND ORDER

WILLIAM W. SCHWARZER, District Judge.

These are actions by former crewmen of the S. S. Mayaguez against the United States under the Suits in Admiralty Act (SIAA), 46 U.S.C. Section 742. Jurisdiction exists under 28 U.S.C. Section 1333(1). Plaintiffs seek damages for personal injuries allegedly suffered during United States military operations in response to the seizure of the Mayaguez by Cambodian gunboats on May 12, 1975. They advance two theories of liability against the government: (1) negligence in undertaking and executing the military operation and (2) breach of a duty to warn the Mayaguez of the danger of such a capture.[1]

---

1. Plaintiffs' opening memorandum advanced a third theory: that the military rescue operation and failure to warn breached the government's duty of good faith as a shipper of goods aboard the Mayaguez. However, the carriage of goods owned by the United States was a mere coinci-dence that did not contribute to the risk of seizure or any consequent injury to the crew. The cases cited by plaintiffs do not support the proposition that because the government was a shipper of goods it owed the Mayaguez any special care in issuing navigational warnings or

At a status conference on December 28, 1979, the Court directed plaintiffs to show cause why it had jurisdiction of the claims stated. The parties filed memoranda and affidavits and appeared at a hearing on February 29, 1980. At that hearing the Court expressed its tentative view that the claim of negligence by the government in connection with the military operation presented a nonjusticiable political question. At the Court's invitation, the parties then submitted supplementary pleadings on the propriety of summary judgment in favor of the government.

### I. Factual Background

The Mayaguez, a privately owned cargo vessel operating under American registry was seized by Cambodian gunboats on May 12, 1975, as it passed within 3 miles of the Poulo Wai Islands in the Gulf of Thailand, 60 miles from the Cambodian coast. The ship had departed Hong Kong on May 8, bound for Sattahip, Thailand, carrying United States military cargo and other freight. At the time, Cambodia, as well as Thailand and Vietnam, claimed sovereignty over the Poulo Wai Islands.

Immediately after learning of the seizure, the United States government undertook surveillance of the Mayaguez and its crew, who were being held on the nearby Cambodian island of Koh Tang. On May 13, after making demands for return of the vessel and the crew through the media and diplomatic channels, President Ford "directed the United States Armed Forces to isolate the island and interdict any movement between the ship or the island and the mainland, and to prevent movement of the ship itself, while still taking all possible care to prevent loss of life or injury to the U.S. captives." (Letter dated May 15, 1975, from President Ford to the Speaker of the House.) Plaintiffs claim that they were injured during engagements between U.S. military aircraft and the boat on which the crew of the Mayaguez was being transported from Koh Tang Island to the mainland.

Plaintiffs have alleged that agencies of the United States had notice, before the Mayaguez left Hong Kong for Sattahip, of similar hostile acts by Cambodia against vessels in waters near the Poulo Wai Islands. In traveling near the Poulo Wai Islands, the Mayaguez followed a trade route described in official publications of the United States government. Means were available to the government to warn ships in port at Hong Kong or at sea, by radio, of the risk of attack or seizure. No such warning was broadcast in advance of the seizure of the Mayaguez.

### II. Liability Based on Military Operations

Plaintiffs argue that the government may be held liable under the SIAA for negligence in undertaking and executing the military operations. This claim raises two issues: (1) whether it is barred by an implied "discretionary function" exception to the waiver of sovereign immunity in the SIAA and (2) whether it presents nonjusticiable political questions.

### A. Discretionary Function Exception

Had this action been brought before 1960, a district court could only have entertained it under the Federal Tort Claims Act (FTCA) which contained an exception for claims based upon the performance of discretionary functions of government. 28 U.S.C. Section 2680(a). In 1960, Congress amended SIAA to eliminate conflict and confusion concerning the respective jurisdiction of the district courts and Court of Claims over actions against the government arising out of admiralty matters. *See* the discussion in *De Bardeleben Marine Corp. v. United States*, 451 F.2d 140, 143–44 (5th Cir. 1971). As a result of the amendment, *the district courts were given jurisdiction over "cases [against the government] where . . . if a private person or property were involved, a proceeding in admiralty could be

in the choice of diplomatic or military tactics after the seizure. Plaintiffs' brief relies on the bill of lading as the basis for a contractual duty on the part of the government, but it cites no promise in the bill of lading that might have

been breached by the government's conduct. The fact that the government was a shipper of goods on the Mayaguez adds nothing to plaintiffs' other theories of liability.

maintained . . ." 46 U.S.C. Section 742. Referring to the legislative history of the amendment, the court in *De Bardeleben* said:

> The Senate Report indicates that the purpose "of the amendments is to make as certain as possible that suits brought against the United States for damages caused by vessels and employees of the United States through breach of contract or tort can be originally filed in the correct court so as to proceed to trial promptly on their merits." And in another part of the Report we learn that the purpose of the bill, as amended, is to authorize the transfer of cases between the U.S. district courts and the Court of Claims, and vice versa. "The bill also clarifies confusing language now existing in section 2 of the Suits in Admiralty Act." Senate Report, *supra*, at p. 3583. 451 F.2d at 145.

The effect of the amendments, enacted to achieve these purposes, was to extend the waiver of sovereignty to cases brought against the United States under the SIAA. In taking this action, Congress was silent on whether the exceptions which would have applied had the case been brought under the FTCA would apply under the SIAA.

The issue whether the discretionary function exception found in the FTCA should be implied under the SIAA has been addressed by four courts of appeals. The First and Seventh Circuits have held that such an exception must be implied. *Bearce v. United States*, 614 F.2d 556, 559–60 (7th Cir. 1980); *Gercey v. United States*, 540 F.2d 536, 539 (1st Cir. 1976), *cert. denied*, 430 U.S. 954, 97 S.Ct. 1599, 51 L.Ed.2d 804 (1977). In doing so, they relied on the narrow purpose of the 1960 amendment to eliminate jurisdictional conflict and confusion, and on the uncalled-for results should the many legislative and administrative judgments concerning the public interest in

maritime matters be subject to independent judicial review. *See also United States v. United Continental Tuna Corp.*, 425 U.S. 164, 176, 96 S.Ct. 1319, 47 L.Ed.2d 653 (1976), commenting on the limited purpose of the 1960 amendments.

The Fourth Circuit, in *Lane v. United States*, 529 F.2d 175 (4th Cir. 1975), stated that a discretionary function exception could not be imported into the SIAA. It did so, however, without discussion of the considerations on which the First and Seventh Circuits relied. The statement may, in any event, have been unnecessary to the decision because other provisions of law imposed a duty on the United States to mark sunken vessels. Finally, in *De Bardeleben, supra*, the Fifth Circuit rejected importation of the discretionary function exception in what clearly was dictum. 451 F.2d at 146.[2]

▊ The question appears to be one of first impression in this circuit. The Court is persuaded by the reasoning of the *Bearce* and *Gercey* decisions. To subject to judicial scrutiny policy decisions made at the highest level of government simply because the action was brought under the SIAA rather than the FTCA would go far beyond the limited purpose of the 1960 amendments and lead to "an intolerable state of affairs." *Gercey, supra*, 540 F.2d at 539.

▊ Having determined that an exception for discretionary functions must be implied under the SIAA, the Court finds that the decision to undertake the rescue operation and its execution fall within that exception. The decision itself involved a "basic policy judgment as to the national interest," *see Gercey v. United States, supra*, 540 F.2d at 539; the discretionary function exception which immunizes that decision against judicial scrutiny extends also to acts of subordinates in carrying it out according to official directions. *See Dalehite v. Unit-*

**2.** The Court in *De Bardeleben*, in rejecting an implied discretionary function exception under the SIAA, feared that it would produce irrational and unintended distinctions, pointing to cases in which liability was imposed upon the United States for the operation of military ves-

sels. 451 F.2d at 146 n. 15. The cases cited, however, involve claims based upon the negligent *operation* of vessels which, as operational acts, would fall outside the scope of the discretionary exception. *See, Gercey v. United States, supra*, 540 F.2d at 539 n. 4.

*ed States,* 346 U.S. 15, 35–36, 73 S.Ct. 956, 968, 97 L.Ed. 1427 (1953).

Plaintiffs' claims based on the government's alleged negligence in the conduct of the rescue operation are therefore not actionable under the SIAA.

**B.** *Justiciability*

■ An alternate ground for dismissing the claims based on the conduct of the military operations is that these claims present nonjusticiable questions. Under the political question doctrine, nonjusticiability is "primarily a function of the separation of powers." *Baker v. Carr,* 369 U.S. 186, 210, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962). In that decision, the Supreme Court defined the elements which serve to identify nonjusticiable political questions:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question. 369 U.S. at 217, 82 S.Ct. at 710.

More recently, Justice Powell, concurring in *Goldwater v. Carter,* 444 U.S. 996, 998, 100 S.Ct. 533, 534, 62 L.Ed.2d 428 (1979), summarized the relevant factors as follows: (i) Does the issue involve resolution of questions committed by the text of the Constitution to a coordinate branch of government? (ii) Would resolution of the question demand that a court move beyond areas of judicial expertise? (iii) Do prudential considerations counsel against judicial intervention?

In deciding to undertake the rescue operation the President exercised his authority over the conduct of foreign relations; in implementing the decision he exercised his powers as commander in chief. *See United States v. Curtiss-Wright Corp.,* 299 U.S. 304, 318–19, 57 S.Ct. 216, 220, 81 L.Ed. 255 (1936) (dictum); *The Prize Cases,* 67 U.S. (2 Black) 635, 670, 17 L.Ed. 459 (1862).[3] Not every question involving the exercise of these powers is necessarily nonjusticiable as a political question. "[A] discriminating analysis of the question posed [is required], in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action." *Baker v. Carr, supra,* 369 U.S. at 211–12, 82 S.Ct. at 706–707.

■ Plaintiffs contend that the President acted negligently in the exercise of his power, arguing that Cambodia's seizure of the Mayaguez in its territorial waters did not violate international law.[4] But that contention is beside the point. It has long been settled that the underlying factual or legal determinations on the basis of which the President conducts the foreign relations of the United States are not subject to judicial scrutiny. *Williams v. Suffolk Insurance Co.,* 38 U.S. (13 Peters) 415, 419–20, 10 L.Ed. 226 (1839) (determination by executive branch that the Falkland Islands were not within sovereignty of Buenos Ayres); *Doe v. Braden,* 57 U.S. (16 Howard) 635, 656–57, 14 L.Ed. 1090 (1854) (determination by the President that the King of Spain had power to nullify a prior land grant by the

---

**3.** *Cf. Goldwater v. Carter, supra,* 100 S.Ct. at 535, 444 U.S. at 999:

> The present case involves neither review of the President's activities as Commander-in-Chief nor impermissible interference in the field of foreign affairs. (Justice Powell, concurring).

**4.** According to the authority relied on by plaintiffs, the dispositive issue under international law would be whether it was reasonably necessary under the circumstances for Cambodia to seize the Mayaguez to find out if it threatened Cambodian security. J. Paust, *The Seizure and Recovery of the Mayaguez,* 85 Yale L.J. 774, 785–95 (1976).

Duke of Alagon); *see also, Oetjen v. Central Leather Co.*, 246 U.S. 297, 302–3, 38 S.Ct. 309, 310–11, 62 L.Ed.2d 726 (1918). Under the doctrine of separation of powers, the making of those determinations is entrusted to the President. They must be accepted by the judicial branch in the carrying out of its functions. Henkin, Foreign Affairs and the Constitution 214 (1972). Thus, the claim that the President was negligent in treating Cambodia's seizure as illegal is nonjusticiable.

That conclusion finds support in the reasoning of the Court in *Baker v. Carr, supra*:

(1) The responsibility for dealing with foreign nations over such matters as the seizure of American persons and property is clearly committed to the President, *United States ex rel. Keefe v. Dulles*, 222 F.2d 390 (D.C. Cir. 1954), *cert. denied*, 348 U.S. 952, 75 S.Ct. 440, 99 L.Ed. 743 (1955);

(2) There are no judicially discoverable and manageable standards for resolving the present issue, *cf. C&S Air Lines v. Waterman Steamship Corp.*, 333 U.S. 103, 111, 68 S.Ct. 431, 436, 92 L.Ed. 568 (1948);

(3) Adjudication would involve a range of initial policy determinations of a kind clearly for nonjudicial discretion;

(4) For the Court to undertake an independent resolution would likely reflect lack of respect due a coordinate branch of government;

(5) Multifarious pronouncements by various departments on the question create a potential of embarrassment.

■ Plaintiffs contend further that the President acted negligently in deciding to use military force to effect the rescue rather than pursuing diplomatic means. The same considerations that bar reexamination of the premises of the President's foreign policy decision to demand immediate return of the vessel and crew bar reexamination of the decision to employ military force. The President, as commander in chief, is "necessarily constituted the judge of the existence of the exigency, in the first instance, and is bound to act according to his belief of the facts." *Martin v. Mott*, 25 U.S. (2 Wheat.) 19, 30, 6 L.Ed. 537 (1827); *see, Henkin, supra*, at 214.

> Certainly it is not the function of the Judiciary to entertain private litigation— even by a citizen—which challenges the legality, the wisdom, or the propriety of the Commander-in-Chief in sending our armed forces abroad or to any particular region.

*Johnson v. Eisentrager*, 339 U.S. 763, 789, 70 S.Ct. 936, 949, 94 L.Ed. 1255 (1950) (rejecting *inter alia* a challenge to the legality of the presence of American troops in China and affirming the dismissal of a habeas corpus petition by a non-resident alien who had been tried and convicted of war crimes).[5]

The indicia of *Baker v. Carr* apply with equal force here. The responsibility for the use of military forces is clearly committed to the President by the Constitution.[6] There are no standards for this Court to judge the reasonableness of the President's actions. His decisions necessarily involved a range of policy determinations entrusted to his discretion. And the prudential considerations identified in *Baker v. Carr* also

---

**5.** *See also The Prize Cases, supra; Atlee v. Laird*, 347 F.Supp. 689 (E.D.Pa.1972), *aff'd without opinion*, 411 U.S. 911, 93 S.Ct. 1545, 36 L.Ed.2d 304 (1973); *Luther v. Borden*, 48 U.S. (7 Howard) 1, 43, 12 L.Ed. 1981 (1849), quoted in *Baker v. Carr, supra*, 369 U.S. at 221, 82 S.Ct. 712:

> After the President has acted and called out the militia, is a Circuit Court of the United States authorized to inquire whether his decision was right? ... If the judicial power extends so far, the guarantee contained in the Constitution of the United States is a guarantee of anarchy, and not of order....

**6.** The proposed text of Article 1, section 8, clause 11 was amended in the Constitutional Convention to give Congress the power to "declare" war, striking the word "make", for the express purpose of leaving to the executive "the power to repel sudden attacks." 2 M. Farrand, The Records of the Federal Convention of 1787, at 318–19 (rev. ed. 1937), quoted in Note, *Congress, the President, and the Power to Commit Forces to Combat*, 81 Harv.L. Rev. 1771, 1773 n. 16 (1968).

strongly oppose independent judicial determination whether the use of military force was reasonable.[7]

Finally plaintiffs contend that a claim for negligence may in any case be based on the manner in which military personnel carried out the President's order. But the same considerations which preclude judicial examination of the decision to act must necessarily bar examination of the manner in which that decision was executed by the President's subordinates. The textual commitment to the President as commander in chief of authority for military decisions entails that his decisions may be implemented without judicial scrutiny. *Durand v. Hollins,* 8 F.Cas. 111 (No. 4186) (C.C.S.D.N.Y. 1860); *cf. Dalehite v. United States, supra,* 346 U.S. at 35–36, 73 S.Ct. at 967–968. Moreover, courts lack standards with which to judge whether reasonable care was taken to achieve tactical objectives in combat while minimizing injury and loss of life. *See Da Costa v. Laird,* 471 F.2d 1146, 1155 (2d Cir. 1973).[8]

The Court concludes that plaintiffs' claims arising out of the military operations fall within the class of claims arising out of determinations entrusted to the executive branch and not subject to review by the courts, and are therefore nonjusticiable.

### III. *The Failure to Warn*

Plaintiffs also seek to hold the government liable for failing to issue a warning about the danger of seizure by Cambodian forces in the waters near the Poulo Wai Islands. They argue that the government had cause to issue such a warning and that the master of the Mayaguez reasonably relied on its absence in charting the freighter's course.

The controlling principle is stated in *Indian Towing Co. v. United States,* 350 U.S. 61, 69, 76 S.Ct. 122, 100 L.Ed. 48 (1955):

> The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light on Chandeleur Island and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning. If the Coast Guard failed in its duty and damage was thereby caused to petitioners, the United States is liable under the Tort Claims Act.

Whether the issuance of broadcast and written warnings by the government from time to time and the publication of sailing directions engendered reasonable reliance and whether the government's failure to warn of risks of seizure was negligent are mixed questions of law and fact which cannot be adjudicated on summary judgment. A trial must be held on those issues. In so holding, the Court intimates no view on the merits of this claim.

Accordingly, defendant's motion for summary judgment is granted with respect to all claims arising out of the military operations and denied without prejudice as to the claims based on defendant's failure to warn.

The parties are directed to appear for a preliminary pretrial conference on August 8, 1980 at 3 p. m., and to confer in advance with respect to the scope of the trial and dates for pretrial and trial.

IT IS SO ORDERED.

---

**7.** Plaintiffs also contend that a private right of action may be implied under the War Powers Resolution of 1973, 50 U.S.C. § 1541–48. The difficulty with plaintiffs' case, however, is not the lack of a cause of action but the lack of justiciability of their claims in view of the separation of powers doctrine. The War Powers Resolution does not affect that doctrine or diminish the authority of the decisions relied on by the Court. This does not, of course, imply any view about the justiciability of other cases under the War Powers Resolution.

**8.** Plaintiffs' reliance on cases which determine the limitations of the immunity doctrine applicable to military officers is beside the point. Immunity may afford an absolute or qualified defense to government officials against otherwise valid claims for damages. The Court holds here, however, that no such claims have been presented in connection with the conduct of the military operations.