OLYMPIA SAUNA COMPANIA NAVI-ERA, S.A., as Owner of the M/V YPATIA HALCOUSSI, Plaintiff,

v.

UNITED STATES of America, Defendant and Third–Party Plaintiff,

v.

Kenneth FLETCHER, in personam and the M/V YPATIA HALCOUSSI, Her Engines, Tackle, Appurtenances, etc., In Rem; Third–Party Defendants.

Civ. No. 80–699 LE.

United States District Court, D. Oregon.

April 14, 1987.

Paul N. Wonacott, Robert I. Sanders, Wood Tatum Mosser Brooke & Holden, Portland, Or., for plaintiff.

Paul Gary Sterling, Asst. Atty. in Charge, WCO, U.S. Dept. of Justice, Torts Branch, Civil Div., San Francisco, Cal., for defendant and third-party plaintiff.

John J. Devine, Poles, Tublin, Patestides & Stratakis, New York City, for third-party defendants.

LEAVY, Circuit Judge, Sitting by Designation:

## I. Introduction

The plaintiff, Olympia Sauna Compania Naviera, S.A. (Olympia Sauna), as owner of the *M/V Ypatia Halcoussi*, brought this action against the United States. Olympia Sauna claimed the United States Coast Guard negligently mispositioned Buoy No. 4 marking Warrior Rock Reef in the Columbia River, causing the *Ypatia Halcoussi* to run aground on the reef.

On September 11, 1984, following a trial to the court, I issued an opinion and order holding that the Coast Guard's negligent maintenance of the buoy was the proximate and sole cause of the *Ypatia Halcoussi's* grounding. I also held this court had jurisdiction under the Suits in Admiralty Act, 46 U.S.C. §§ 741–52 (SIAA). The United States appealed this decision.

The Ninth Circuit Court of Appeals remanded the case, on grounds the "opinion and order ... does not sufficiently set forth findings of fact to support its conclusion that the Coast Guard's negligence caused the grounding of the *Ypatia Halcoussi.*" (774 F.2d 1174 (9th Cir.1985), as amended by Order of Jan. 2, 1986). Specifically, the Ninth Circuit held that this court failed to identify any acts or omissions by the Coast Guard District Office to support the finding that it negligently positioned Buoy No. 4 or that it was negligent in allowing the buoy to remain off its charted position. Furthermore, the Ninth Circuit held there were no findings that the Coast Guard District Office had actual or constructive notice that Buoy No. 4 was off position, or that it failed to provide adequate notice to mariners of Buoy No. 4's position.

The factual background was described in this court's previous opinion and order, and need not be repeated, except to expand upon the role of the Coast Guard District Office, as described below.

On remand, this court must decide the following issues:

1. Is the Coast Guard District Office protected by the discretionary function exception in carrying out the grid positioning project;

2. If not, what acts or omissions by the Coast Guard District Office, if any, were negligent;

3. If the Coast Guard District Office was negligent in implementing the grid positioning project, was it negligent in allowing Buoy No. 4 to remain off station and failing to warn mariners that the buoy was off station.

## II. Relevant Facts on Remand

The Coast Guard maintains a national system of navigational aids which includes

Buoy No. 4, marking Warrior Rock Reef in the Columbia River. Buoy No. 4 is among those navigational aids for which the Coast Guard's Thirteenth District Office (the District Office) in Seattle, Washington is responsible. Navigational aids, including buoys, require regular maintenance to insure they are operating properly and positioned correctly. The Coast Guard buoy tender *Whitebush* was responsible for maintaining Buoy No. 4 at the time concerned here.

Formerly, Coast Guard buoy tender personnel used a three arm protractor to plot a buoy's position as they attempted to place the buoy sinker on the buoy's charted position. However, beginning in 1977, the Coast Guard introduced a new system of positioning navigational aids, termed the grid positioning project. (Clark, Tr. 923–25). The goals and standards of the grid positioning project are described in the Coast Guard manual *Aids to Navigation—Positioning,* (Manual) issued June 19, 1978. (Exhibit 23). The project's purpose was to develop and implement a more accurate buoy positioning method. (Clark, Tr. 923–25). The parties agree that if proper data is used, the Coast Guard's grid positioning method is highly accurate, and is more accurate than the three arm protractor method. (Crisp, Tr. 605; Clark, Tr. 927–28, 992; Memorandum of United States on Remand, p. 3; Olympia Sauna's Brief on Remand, pp. 7–8).

The grid positioning project involves measuring the incremental changes in the angle between various surveyed objects using intersecting lines, called lines of position (LOP). (Exhibit 23; Crisp Tr. pp. 590–93). The navigational aid's charted position, which a buoy tender tries to achieve when positioning a buoy, is suppose to be the center of the grid formed by the LOPs.

The Positioning Manual instructs those implementing the grid project to use surveyed objects which produce the "strongest available fixes" and "at least 3 LOPs" to minimize error in buoy positioning. (Exhibit 23, pp. 1–3 and 1–2). The strongest fixes are those having small gradients and crossing angles between 30° and 90°. (Plain-tiff's Exhibit 23, pp. 1–6 and C–1; Crisp, Tr. 666). To obtain strong fixes, the Manual directs that surveyed and charted objects be used, as well as surveyed but uncharted objects that are shown on documents from the National Ocean Survey (NOS) and National Geodetic Survey (NGS), both components of the National Oceanic and Atmospheric Administration (NOAA). (Exhibit 23, pp. 1–5 and 1–6).

The Coast Guard District Offices are responsible for developing grids to position the individual buoys within their jurisdiction. To produce a grid, the District Office accumulates information concerning objects in the vicinity of the buoy's charted position. This includes "shots" made by the buoy tender personnel of the landmarks observable in the field and information on surveyed objects from the NOS and NGS. (Clark, Tr. 1000–07; Crisp, Tr. 593, 636, 667–68). From this list of "shot" and surveyed objects, the District Office chooses which ones to use in calculating a particular buoy's grid, depending on the accuracy of the information. (Clark, Tr. 1006). The chosen information is fed into a computer at the District Office, which generates the positioning grid. (Clark, Tr. 1004–07). The District Office gives this grid to the buoy tenders in the field, which instructs them as to what objects and angles to use in positioning the buoy. (Clark, Tr. 1001, 1006–07). The goal is to set the buoy within the "target circle" surrounding the charted position at the grid's center. (Crisp, Tr. p. 616).

This procedure was followed in producing the grid for positioning Buoy No. 4 on March 6, 1980. (Crisp, Tr. pp. 590, 640). The District Office received information concerning surveyed objects near the charted position of Buoy No. 4 from the field and NOS documents. It then selected those objects on which to base the grid and its computer generated a grid for the *Whitebush's* use in positioning Buoy No. 4.

The Coast Guard District Office relied on four objects to produce the Buoy No. 4 grid: 1. Warrior Rock Range Front Light; 2. Light 2; 3. Light 4A; and 4. Duck Club Light 6. (Exhibit 35). The District Office

generated three LOPs from these objects: between objects 1 and 2, 3 and 4, and 2 and 4.

The *Whitebush* visited Buoy No. 4 on March 5, 1980, and finding the buoy off its charted position, attempted to reposition it. However, it was unsuccessful in doing so, and returned the next day. (Crisp, Tr. 615–16). On March 6 the *Whitebush* repositioned Buoy No. 4, using the grid supplied to it by the District Office. The *Whitebush* also performed additional checks by taking bearings to the designated objects and measuring the water depth. The measured water depth where Buoy No. 4 was repositioned to was 30 feet. (Crisp, Tr. 628–29). Chief Crisp, of the *Whitebush,* believes they left the buoy on its charted position on March 6. (Crisp, Tr. 631). On March 8, 1980, the *M/V Ypatia Halcoussi* ran aground on Warrior Rock Reef.

The data gathered by the *Whitebush* when it repositioned Buoy No. 4 on March 6 was sent to the District Office, but not received until after the grounding. On March 31, 1980, the District Office determined from this data that the *Whitebush* had placed the sinker of Buoy No. 4 slightly outside and downstream from the target circle, though generally along the channel line from the charted position. This is "Position C." (Clark, Tr. 967; Exhibits MM and MM–1). Two days after the grounding, on March 10, the Corps of Engineers (the Corps) found the buoy portion of Buoy No. 4 further downstream than both sinker position C and the charted position. This is "Position 14." (Exhibit MM and MM–1; Lubin, Tr. 392; Clark Tr. 967).

### III. Contentions on Remand

Olympia Sauna contends that the District Office was negligent in the placement of Buoy No. 4 because in developing the buoy grid, it did not use those surveyed objects which produce the strongest fix. It alleges that the objects used by the Coast Guard instead produced an inaccurate fix because the resulting angle gradients were too

large. There were at least three surveyed objects which the Coast Guard did not use, but had they been used, a stronger fix allegedly would have resulted. In its Brief on Remand, Olympia Sauna describes these objects as Shore Cap (also known as Dolphin), Warrior Rock Range Rear Light, and a Stack in Scappoose. (Brief on Remand, p. 10). In its Reply Brief, Olympia Sauna omits Warrior Rock Range Rear Light and adds Lake Cap. (Reply Brief, p. 9).

Olympia Sauna contends these objects were surveyed before the accident, and therefore were available to the Coast Guard. These objects are shown on Corps of Engineers condition survey charts. Also, the Stack is labelled, and the Shore Cap and Lake Cap are shown by symbols, though not labelled, on a 1977 NOS chart. (Exhibit 4).

Olympia Sauna asserts that use of these other objects in producing the grid would have resulted in accurate placement of the buoy, and that their absence made the grid defective. To support this, Olympia Sauna relies on Exhibits 34, pp. 1–88 and 1–89; 35; 51, p. 2–31; and 58. Although Olympia Sauna has apparently confused some exhibit numbers in its brief, the court was able to follow its argument.[1]

Exhibit 34, p. 1–88 is the post-accident grid (March 17, 1980) for the position to which Buoy No. 4 was relocated after the grounding. It includes the four objects used by the *Whitebush* to position the buoy on March 6, 1980, and adds two more: Warrior Rock Range Rear Light and Shore Cap (Dolphin). Exhibit 34, p. 1–89 is another grid for Buoy No. 4, prepared sometime after the grounding. It includes the four original objects used and adds the Scappoose Stack. Exhibit 35 is the grid used to position Buoy No. 4 on March 6, showing the four objects used. Exhibit 51, p. 2–31, dated October 12, 1977, describes the latitude and longitude of a "dolphin" used to position Buoy No. 4 under the old protrac-

---

1. For example, on page 11 of its Brief on Remand, Olympia Sauna refers to Exhibit 58 as indicating the Shore Cap Dolphin object was added to obtain a fix, and points to testimony allegedly supporting this. However, Ex. 58 adds

Warrior Rock Range Rear Light, not Shore Cap. Olympia Sauna obviously meant to cite Ex. 34, p. 1–88, which does add Shore Cap. The cited testimony also describes Ex. 34.

tor method. Although Olympia Sauna contends this reference is to Shore Cap, the government points out that the latitude and longitude demonstrate it refers to Lake Cap. (Memorandum of United States on Remand, p. 12–13). Exhibit 58 is another grid for Buoy No. 4, prepared March 31, 1982. It uses the original four survey objects and adds Warrior Rock Range Rear Light.

Olympia Sauna asserts that use of these other objects would have produced stronger fixes. Exhibit 58 states at the bottom which combination of three angles produces the best fix. These differ from the angles on Exhibit 35 (the grid used on March 6, 1980), but only one involves the use of an object not used in preparing the Exhibit 35 grid (angle 7). Chief Crisp admitted that the grid prepared on March 17, 1980 (Exhibit 34), which includes Warrior Rock Range Rear Light and Shore Cap, produced better crossing angles and gradients than the grid used on March 6, 1980. (Crisp, Tr. 667). He also stated that only two of the three crossing angles used on the March 6, 1980 grid met the goal standard of being between 30° and 90°. (Crisp, Tr. 666–67).

The Government counters that there is no evidence to support Olympia Sauna's contention that all of the additional objects were surveyed before the accident. Moreover, the government contends there is no evidence that the objects actually used by the *Whitebush* to position the buoy on March 6, 1980 made the grid defective.

The government claims that neither the transcript nor the exhibits show that Shore Cap was a surveyed object before the accident. As stated above, Exhibit 34, p. 1–88 was prepared after the grounding, and the transcript reference cited by the plaintiff does not state that Shore Cap was surveyed before the grounding. (Crisp, Tr. 640–41). As also mentioned above, the 1977 reference to a "dolphin" on Exhibit 51, p. 2–31 may actually refer to Lake Cap, not Shore Cap. Because Shore Cap allegedly was not surveyed before March 6, 1980, it was not used for the positioning grid. The government does not discuss the

other specific objects suggested by Olympia Sauna (Lake Cap, Warrior Rock Range Rear Light, and the Scappoose Stack). Nor does it discuss the grids produced using these other objects.

The government reiterates that the Coast Guard was limited to using accurately surveyed objects appearing on NOS navigational charts. It does not address the appearance of these objects on Corps maps, or the appearance of three of the objects on a January 6, 1979 NOS chart (Shore Cap and Lake Cap by symbol, Stack by label). (Exhibit 4).

Olympia Sauna supports its claim that Buoy No. 4 was negligently positioned by asserting it was placed in shallower water and farther up the reef than contemplated by the *Whitebush*. After repositioning the buoy on March 6, 1980, Chief Crisp measured the water depth. Correcting for the vessel draft, he measured the water depth at the sinker as thirty feet. (Crisp, Tr. 628–29). Olympia Sauna contends the buoy was actually placed in twenty-two feet of water, farther up the reef, as shown by the Corps survey taken March 10, 1980. (Position 14). This allegedly resulted in a cross-channel difference in the buoy's placement between the intended and actual positions of at least fifty feet, enough to cause the accident. Therefore, Olympia Sauna concludes the grid positioning system used was not accurate. Olympia Sauna contends that even buoy Position C, calculated by the measurements taken on March 6, places the buoy in twenty-two feet of water.

The United States disputes this claim. It points out that Chief Crisp measured the water depth at thirty feet on March 6 when he repositioned the buoy. It states that Position C is a more reliable indication of the buoy's position on March 6 than where the Corps measured it on March 10, because Position C was calculated from measurements taken on March 6. Finally, the government states that because the Corps measures a buoy's placement where the floating part is located, not where the sinker is located, Position 14 does not accurately show the sinker's position. (Clark, Tr.

988). Rather, one would expect the floating portion to be downstream of the sinker. Therefore, the government asserts it cannot be concluded from Position 14 that the sinker was in less than thirty feet of water.

Finally, the United States claims that Olympia Sauna's action is barred by the discretionary function exception to the United States' waiver of sovereign immunity. It states that the District Office's allegedly negligent action in choosing the manner and means to implement the Aids to Navigation Position Project is clearly discretionary.

### IV. Previous Findings by this Court

Among many findings made by this court in the September 11, 1984, Opinion and Order, 604 F.Supp. 1297, several which were not questioned by the Court of Appeals are worth summarizing here. This court did not find that the *Whitebush* crew improperly used the grid system provided it by the Coast Guard District Office. (Opinion and Order, p. 1302). Nonetheless, Buoy No. 4 was not on its charted position on March 8, 1980, the date of the grounding. (*Id.* at 1304). No other vessels or environmental conditions were shown at trial to have significantly affected the buoy's position between March 6 and March 8. While Buoy No. 4 is not necessarily dangerously misleading to mariners if it is off its charted position, on March 8, Buoy No. 4 was off its charted position and towards the Oregon shore enough that it dangerously misled the *Ypatia Halcoussi* to turn too soon. (*Id.* at 1304). Neither the river pilot nor the *Ypatia Halcoussi* crew was negligent. (*Id.* at 1304). The river pilot reasonably relied on the charted position of Buoy No. 4 in making the turn. (*Id.* at 1304–05).

### V. Discussion and Findings

#### A. Suits in Admiralty Act and the Discretionary Function Exception

■ The government raises the threshold question which must be addressed first in determining whether the Coast Guard District Office was negligent: do the District Office's actions in implementing the grid positioning project fall within the discretionary function exception to the United States' waiver of sovereign immunity?

Prior to 1960, a district court could only have heard this type of action under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2680. The FTCA recognizes an exception to the federal government's waiver of sovereign immunity for "the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a)

In 1960, Congress amended the SIAA to eliminate confusion concerning the jurisdiction of the district courts and The Court of Claims over actions against the United States arising out of admiralty. The amendments' effect was to extend the waiver of sovereign immunity under the FTCA to cases brought against the United States under the SIAA. *United States v. United Continental Tuna Corp.*, 425 U.S. 164, 175–76 and ,n. 14, 96 S.Ct. 1319, 1326 and n. 14, 47 L.Ed.2d 653 (1976); *Roberts v. United States*, 498 F.2d 520, 525–26 (9th Cir.1974); *De Bardeleben Marine Corp. v. United States*, 451 F.2d 140, 145–47 (5th Cir.1971). However, Congress was silent on whether the exceptions under the FTCA would also apply under the SIAA. Several circuits have incorporated the FTCA's discretionary function doctrine into the SIAA. *Wiggins v. United States*, 799 F.2d 962 (5th Cir.1986); *Brown v. United States*, 790 F.2d 199 (1st Cir.1986); *Eklof Marine Corp. v. United States*, 762 F.2d 200 (2nd Cir.1985); *Drake Towing Co., Inc. v. Meisner Marine Construction Co.*, 765 F.2d 1060 (11th Cir.1985); *Gemp v. United States*, 684 F.2d 404 (6th Cir.1982); *Bearce v. United States*, 614 F.2d 556 (7th Cir. 1980). *See also Gercey v. United States*, 540 F.2d 536 (1st Cir.1976) *cert. denied*, 430 U.S. 954, 97 S.Ct. 1599, 51 L.Ed.2d 804 (1977). Similarly, a district court in this circuit has followed the reasoning of the above cases. *Rappenecker v. United States*, 509 F.Supp. 1024 (N.D.Cal.1980).

Like the *Rappenecker* court, I am persuaded by the reasoning of the above decisions. "To subject to judicial scrutiny policy decisions made at the highest level of

government simply because the action was brought under the SIAA rather than the FTCA would go far beyond the limited purpose of the 1960 amendments and lead to an 'intolerable state of affairs'." *Rappenecker*, 509 F.Supp. at 1027 (quoting *Gercey*, 540 F.2d at 539). Therefore, I conclude that the SIAA incorporates the discretionary function exception of the FTCA.

### B. Application of Discretionary Function Exception

The discretionary function doctrine was delineated in *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955). The Supreme Court established that where the government undertakes to warn the public of danger and thereby induces reliance, it must perform its "good Samaritan" task carefully. *Id.* at 64–65, 76 S.Ct. at 124. There, the Coast Guard maintained a lighthouse, which allegedly was not working on the datè a barge went aground. The petitioners claimed the Coast Guard was negligent in failing to check the light's operating system and to warn it was not functioning. The Court stated that while the Coast Guard need not undertake the lighthouse service, once it exercised its discretion to operate the light, it was obligated to use due care to ensure it was in good working order and if it became extinguished, to use due care to discover this fact and repair it or warn of its malfunction. *Id.* at 69, 76 S.Ct. at 126–27. The discretionary activity was the policy decision to operate the lighthouse. Implementing that decision was not discretionary, and thus required due care.

The discretionary function exception reflects the constitutional separation of powers between the judicial branch and the executive and legislative branches. Congress wished to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through a tort action. *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig)*, 467 U.S. 797, 814, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660 (1984). Thus, if judicial review would encroach upon this type of balancing by an agency, the discretionary exception applies. *Id.* at 820, 104 S.Ct. at 2767–68; *Begay v. United States*, 768 F.2d 1059, 1064 (9th Cir.1985).

Although the contours of the discretionary function cannot be defined with precision, *Varig* attempted to outline the type of government conduct that would fall within the exception:

> [I]t is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exemption applies in a given case. ... Thus, the basic inquiry concerning the application of the discretionary function exemption is whether the challenged acts of a government employee—whatever his or her rank—are of the nature and quality that Congress intended to shield from tort liability.

*Varig*, 467 U.S. at 813, 104 S.Ct. at 2764. *See also Mitchell v. United States*, 787 F.2d 466, 468 (9th Cir.1986); *Chamberlin v. Isen*, 779 F.2d 522, 524 (9th Cir.1985). The *Varig* court reaffirmed the *Dalehite v. United States*, 346 U.S. 15, 34, 73 S.Ct. 956, 967, 97 L.Ed. 1427 (1953) holding that discretionary functions include the initiation of programs as well as determinations made by executives or administrators in establishing plans, specifications, or schedules of operations. *Varig*, 467 U.S. at 811–14, 104 S.Ct. at 2763–65.

Although the facts of each case must be analyzed individually, the *Indian Towing* standard has not changed much over the years. Thus, in *Mitchell*, the Ninth Circuit held that the Bonneville Power Administration's (BPA) decision to rely on a Federal Aviation Administration recommendation not to install warning devices on its ground wires was within BPA's discretionary authority. There, the plaintiff's husband was flying a crop duster which struck the unmarked power transmission lines, resulting in his death. The court found the BPA decision was based on social, economic, and political policy. *Mitchell*, 787 F.2d at 468. The court specifically pointed out that this was not a case in which BPA had negligently installed or maintained warning devices. *Id.* In *Begay*, Navajo Indian miners

exposed to radiation in uranium mines brought an action against the United States under the FTCA alleging they contracted various diseases because of the failure of federal and state agencies to warn them of the dangers involved in the mining. As in *Mitchell,* the *Begay* court held that an agency decision *not* to warn was clearly the type of decision Congress sought to protect from judicial review under the discretionary function exception. *Begay,* 768 F.2d at 1066. Other circuits have held similarly: *Bearce v. United States,* 614 F.2d 556 (7th Cir.1980) (Coast Guard not liable in boater's death for deciding not to post a light on end of breakwater, because how to allocate money among all potential Coast Guard projects is discretionary); *Gercey v. United States,* 540 F.2d 536 (1st Cir.1976) (how the Coast Guard should allocate limited resources among a myriad of regulatory responsibilities involves a basic policy judgment).

■ In contrast, where the government has made the policy decision to act, but in carrying out this decision it affirmatively and dangerously misleads the public, its actions may not be protected by the discretionary function exception. Merely that some choice is involved in carrying out the policy is insufficient to activate the exception. *Aslakson v. United States,* 790 F.2d 688, 693 (8th Cir.1986); *Drake Towing,* 765 F.2d at 1064. In *Eklof Marine,* a ship ran aground on a reef, allegedly because the Coast Guard buoy incorrectly marked the reef's location. The Second Circuit held that if the Coast Guard had left the reef completely unmarked, there would be no basis for liability because the decision whether to mark the reef was discretionary. But "once the Coast Guard acts, and causes others justifiably to rely on such action, a duty arises to act reasonably and with due care to prevent a navigational aid from becoming 'a trap for the ignorant or unwary rather than a warning of danger'." *Eklof,* 762 F.2d at 203 (quoting *Somerset Seafood Co. v. United States,* 193 F.2d 631, 635 (4th Cir.1951)).

The First Circuit described the dividing line between liability and nonliability: "[i]n these cases [imposing liability] the government created the danger after the critical discretionary decision had been made." *Brown,* 790 F.2d 199, 203 (1st Cir.1986) quoting *Wysinger v. United States,* 784 F.2d 1252, 1253 (5th Cir.1986). The *Wysinger* court reaffirmed the *Indian Towing* standard that "once the government has made a decision to act the government is responsible for acts negligently carried out even though discretionary decisions are constantly made as to how those acts are carried out." *Wysinger,* 784 F.2d at 1253.

■ In this case, I find that the Coast Guard decision to implement a new program for positioning aids to navigation falls within the discretionary function exception. The Coast Guard's decision to switch to the grid positioning method, which all parties agree is superior to the protractor method, is clearly the type of policy decision best left to the agency having the expertise to weigh the social, economic, and political factors that go into such a decision. It is inappropriate for a court to second guess such an overall policy change in the context of a tort action. Similarly, as expressed in *Dalehite,* it is within the Coast Guard's discretion to determine the standards and specifications to guide the grid positioning project. These, too, require balancing the large need for different types of navigational aids against the budgetary constraints to meet this need and the personnel and technology available to gather the necessary information. Thus, the Coast Guard's decision to use only surveyed objects and at least three LOPs to produce the strongest fixes available in generating its buoy grids is discretionary.

However, once the government has decided to locate a buoy the choice of which surveyed objects and LOPs to use is not the type of decision requiring the weighing of social, economic, or political factors. There is no discretion involved in carrying out the grid positioning project, once the implementation method was established— use of those surveyed objects and at least three LOPs producing strong fixes. "Where the challenged governmental activ-

ity involves safety considerations under an established policy rather than the balancing of competing public policy considerations, the rationale for the exception falls away and the United States will be held responsible for the negligence of its employees." *Aslakson,* 790 F.2d at 693. While choice of which objects to use involves some degree of judgment by the Coast Guard personnel, it is not the type of judgment that involves weighing public policy considerations. Rather, "it is the kind of judgment that requires the knowledge and professional expertise of government employees who implement government policies." *Id.; Griffin v. United States,* 500 F.2d 1059, 1066 (3d Cir.1974).

Moreover, the government has not demonstrated that generating information from different combinations of surveyed objects and LOPs places any budgetary constraints on it. By its own terms in establishing the project, the government already has the information from NOS charts on the location of accurately surveyed objects in the vicinity of a buoy, and its buoy tenders are supposed to "shoot" the angles of *all* such objects visible in the field. Thus, the government will not incur additional costs by better using the information it already has.

Unlike the cases relied on by the government, producing the actual grid is not a decision to decline to act (as in *Mitchell, Begay, Gercey, Gemp, Bearce* ). Nor is it a decision regarding the degree to which to mark a hazard or the degree to which to carry out a regulatory enforcement program (as in *Varig, Brown, Cunningham v. United States,* 786 F.2d 1445 (9th Cir. 1986), *Proctor v. United States,* 781 F.2d 752 (9th Cir.1986), *Magno v. Corros,* 630 F.2d 224 (4th Cir.1980), *Chute v. United States,* 610 F.2d 7 (1st Cir.1979). Finally, unlike *Chamberlin,* this is not a case in which the Coast Guard employees generating the grid have been allowed independent judgment by statute and guidelines.

The government's expansive interpretation of discretionary function would result in the exception swallowing the rule. *Aslakson,* 790 F.2d at 693; *Estate of Callas v. United States,* 682 F.2d 613, 611 (7th Cir.1982). Rather, producing the grid requires implementing policy decisions already made, according to standards already established. Due care must be exercised in so doing.

## C. Negligence of the District Office

■ The danger created by a marine obstruction defines the scope of the Coast Guard's duty to mark it, once the Coast Guard acts to do so. *Eklof Marine,* 762 F.2d at 203. While the Coast Guard's Positioning Manual does not establish the standard of due care, it, along with trial testimony and other exhibits, are evidence of it. *Tringali Bros. v. United States,* 630 F.2d 1089, 1093–94 (5th Cir.1980).

The government attempts to diminish the degree to which this court should look to the Manual for evidence of the due care standard. It states that the Manual did not establish standards for the new grid system, but rather it was one of the Manual's purposes to establish such standards. The government asserts the grid system was in its first stage of development in March 1980. However, the Coast Guard was not simply exploring the grid system's accuracy on an experimental basis while using the older three arm protractor method to position buoys. Rather, it had abandoned the older method entirely, at least for Buoy No. 4, and was relying solely on the grid positioning method. Whether the Manual's directives are termed "standards" or "goals" is irrelevant. They were the only guidelines by which the District Office personnel carried out their task to position buoys accurately.

The Manual describes the shortcomings of prior positioning methods, and sets forth specific steps that can be taken now to minimize error in implementing the new grid system. As described above, this includes using the strongest available fixes, which are those having small gradients and crossing angles between 30° and 90°. It also includes using only surveyed objects. These guidelines are supported by trial testimony. Chief Crisp testified that crossing angles between 30° and 90° should be used

whenever possible, and that he wanted to obtain the smallest gradients possible giving the strongest line. (Tr. 625, 666; see also Clark testimony). As Mr. Clark stated, the Coast Guard wanted to get the most out of the resources it had when implementing the grid system. (Tr. 931).

I find that the District Office was negligent in implementing the grid positioning project, because it did not exercise due care in using all the information available to it to generate an accurate grid for Buoy No. 4, nor did it exercise due care in how it used the information it did select. Rather than warn of a danger, the grid used resulted in a buoy that was a "trap for the ignorant or unwary." *Eklof*, 762 at 203.

The District Office received information from shootings taken of all the objects visible from Buoy No. 4, yet it did not use all these objects in creating the grid. (Crisp, Tr. pp. 636–41). There is no evidence that the District Office generated a variety of grids from the information available to it to see which produced the best grid. All the court has been shown is that the District Office used only four objects in generating one grid for Buoy No. 4. Chief Crisp admitted that only two of the three crossing angles on the grid used to position Buoy No. 4 on March 6, 1980 met the goal of being between 30° and 90°. (Tr. 666–67). However, Exhibit 58 shows that even using only these four objects, better angles could have been produced if the District Office had combined the objects differently. Moreover, other surveyed objects existed about which the Coast Guard already had information that could have been used and would have produced a more accurate grid. The Stack, Warrior Rock Range Rear Light, Shore Cap, and Lake Cap appear on the 1979 NOS map, a source which the Coast Guard admits is accurate in showing surveyed objects. These objects also appear on Corps survey charts. Chief Crisp admitted that the grid prepared only a few days after the accident, which included Warrior Rock Range Rear Light and Shore Cap, produced better crossing angles and gradients than the grid used on March 6, 1980. (Exhibit 34, p. 1–88; Tr. 667). This was the very grid used to reposition Buoy

No. 4 after the grounding. Similarly, Exhibit 58 shows that a better grid was possible using the Stack.

In sum, on the date it generated the grid for Buoy No. 4, the Coast Guard District Office had available to it information which would have produced an accurate grid. It would not have required more money or personnel time to gather that information. All that was necessary was to feed the data on these other objects into the computer. That an accurate grid would have been produced is best shown by the Coast Guard's own actions in repositioning Buoy No. 4 after the grounding, using information available to it before the grounding. That an inaccurate grid was generated instead has been shown in several ways.

The measurements taken by the *Whitebush* on March 6, 1980 and later analyzed by the District Office (Position C) show the buoy was outside the target circle, as does the survey taken by the Corps on March 10, 1980 (Position 14). An expert witness of the plaintiff, Mr. Lubin, developed a detailed model of the route the *Ypatia Halcoussi* would have taken based on various positions of the buoy. While the charted position would not have resulted in a grounding, the model showed that Position 14 would. Thus, the difference between the charted position and Position 14 was sufficient to cause the grounding. (Tr. 392–402). One angle on the grid used on March 6 did not meet the Coast Guard's own guidelines. As described in this court's earlier opinion, another river pilot who had passed Buoy No. 4 earlier in the day on March 8 found the buoy out of position and towards the Oregon shore. Others running the Warrior Rock Reef area on March 6, 1980 and in the days after also observed the buoy to be out of position, towards the Oregon shore. (Exhibit 261, stipulated testimony of Captain Jay Kinney and Captain Herbert L. Becken).

It should not require a ship grounding for the Coast Guard to use the best information available to it within reasonable cost to position a buoy accurately. I find the Coast Guard District Office negligent

in its implementation of the grid positioning project with respect to Buoy No. 4.

> D. Negligence of the District Office in Allowing the Buoy to Remain Off–Station and Failing to Warn Mariners

■■■■ The Coast Guard has a duty to use due care in ascertaining whether its buoys are off station, and to reposition them or give warning that they are out of position. *Indian Towing*, 350 U.S. at 69, 76 S.Ct. at 126–27. While it is usually necessary to prove the government had actual or constructive notice that a buoy was not in place to sustain a negligence claim, where the government negligently created the dangerous situation, such notice is presumed. *In re Inland Towing Corp.*, 307 F.Supp. 874, 880 (E.D.Va.1969); *Furlough Inc. v. United States*, 1983 A.M.C. 2350, 2354 (E.D.Va.1981); *Chesapeake & Ohio Railway Co. v. United States*, 1966 A.M.C. 1883, 1884 (E.D.Mich. 1962).

I have already held that the Coast Guard District Office was negligent in its creation of the grid, resulting in the mispositioning of Buoy No. 4. Therefore, it is presumed the District Office had constructive notice the buoy was out of position once it generated the inaccurate grid. It is not a justifiable defense that the District Office had no actual notice that the buoy was out of position because it received the *Whitebush's* positioning data in the mail, a week or so after the positioning. Given the large daily volume of ship traffic in that stretch of the Columbia and the importance of Buoy No. 4 in marking a hazard, ignorance is not bliss. The Coast Guard admits it can communicate directly and quickly with its vessels in the field through a phone/radio patch. (Anderson, Tr. 823–24). Given the problems on March 5 and 6, and historically, in positioning Buoy No. 4, it would have been prudent to receive the data quickly and process it.

The District Office is responsible for promptly disseminating through broadcasts and/or local notices to mariners any discrepancies between the charted and actual positions of navigational aids. (Exhibit 22 .at A–2, ¶ A–1I). There is no dispute that the District Office, or any other Coast Guard unit, failed to warn that Buoy No. 4 was off-station as of March 6, 1980. Thus, the District Office is also negligent for failing to warn mariners that Buoy No. 4 was misleadingly out of position.

### VI. Conclusions of Law

The implementation of the Coast Guard's grid positioning project by the District Office is not a discretionary function. Rather, it must be carried out with due care. The District Office did not use due care in generating the grid used to position Buoy No. 4 on March 6, 1980. It did not use the best information which was available to it within reasonable cost. Instead, it generated an inaccurate grid that did not meet even its own internal guidelines. The *Whitebush* used this grid, resulting in the mispositioning of Buoy No. 4.

Testimony of other mariners and measurements of Buoy No. 4's location (Positions C and 14) indicate that the buoy was off its charted position and toward the Oregon shore enough that it dangerously mislead the *Ypatia Halcoussi* to turn too soon. Had the vessel not turned too early, it would not have struck Warrior Rock Reef. Had Buoy No. 4 been on its charted position, it would not have turned too early and would not have grounded. This constitutes negligence by the District Office.

The Coast Guard District Office was further negligent in failing to warn mariners that the buoy was out of position on March 6, 1980.

This opinion constitutes the findings of fact and conclusions of law required by Fed.R.Civ.P. 52.

IT IS ORDERED that a time be set for trial on the issue of damages.